UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN McDONNELL, ANTHONY INSINGA, ROBERT MICHIELS and JOHN DEVIVO, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ROYAL DUTCH SHELL PLC, BP PLC, STATOIL ASA, MORGAN STANLEY, TRAFIGURA BEHEER B.V., TRAFIGURA AG, PHIBRO TRADING LLC, VITOL, S.A. and JOHN DOES 1-50, <br><br> Defendants. | Case No.: _____ <br><br> ECF Case <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Based upon investigation of counsel from publicly available information including information about prices, the North Sea Brent Crude Oil market, the European Commission ("EC") and other investigations relating to violations of the Platts Market-On-Close price assessment process, reports published by and on behalf of the International Energy Agency, the International Energy Forum, the Organization of Petroleum Exporting Countries and the International Organization of Securities Commissions ("IOSCO"), Plaintiffs allege, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

## I.   NATURE OF THE ACTION

1.   This action arises from a manipulation of North Sea Brent Crude Oil (as defined herein) and related markets by Defendants Royal Dutch Shell plc ("Shell"), BP plc ("BP"), Statoil ASA ("Statoil"), Morgan Stanley, Trafigura Beheer B.V., Trafigura AG, Phibro Trading LLC ("Phibro"), Vitol, S.A. ("Vitol") and others during the period of at least 2002 through the present (the "Class Period").

2.   During the Class Period, Defendants monopolized the Brent Crude Oil market and entered into an unlawful combination, agreement, and conspiracy to fix and restrain trade in, and intentionally manipulate Brent Crude Oil prices and the prices of Brent Crude oil futures contracts traded on the New York Mercantile Exchange ("NYMEX") and domestically on electronic boards of trade and on exchanges such as the Intercontinental Exchange ("ICE"), accessible in the United States, in violation of the Commodity Exchange Act, as amended 7 U.S.C. § 1, et seq. (the "CEA"), the Sherman Act, 15 U.S.C. §§ 1 and 2, and common law.

3.   During the Class Period, Plaintiffs were among the largest traders of Brent Crude Oil futures contracts on NYMEX and ICE.

4.   Brent Crude Oil is a light sweet crude oil that is pulled from the North Sea region of Europe.  Crude oil is one of the most vital commodities in the world, serving as the essential product for modern end-use applications varying from household plastics to transportation. Types of crude oil vary depending on the geographic location from which the oil is pulled, with end users generally preferring light, sweet oil like Brent Crude Oil, which has a lower sulfur content and requires less processing to remove impurities.  Because of its unique, preferred qualities, Brent Crude Oil is in high demand and serves as a benchmark for two-thirds of the world's internationally-traded crude oil supplies.

5.   Trading in physical commodities like Brent Crude Oil is largely accomplished through private transactions.  Therefore, to bring transparency to crude oil pricing, large market participants like Defendants voluntarily provide their trades to Platts, a unit of McGraw Hill Financial, Inc. in New York.  Platts operates an energy information and global price reporting service and is a world leader in publishing energy-price benchmarks.  As a premier source of benchmark price assessments for the underlying physical price for Brent Crude Oil, Platts' price

assessments serve as the basis for pricing physical Brent Crude Oil cargoes and Brent Crude Oil derivatives contracts, including NYMEX and ICE Brent Crude Oil futures contracts.

6.  Platts' Dated Brent is a benchmark assessment of the price of physical, light sweet North Sea crude oil.  The term "Dated Brent" refers to physical cargoes of crude oil in the North Sea that have been assigned specific delivery dates.  The primary benchmark for Brent Crude Oil is Dated Brent, which is based on cargo sizes of Brent Crude Oil (*e.g.,* 600,000 barrels) with actual loading times.  Dated Brent is therefore intended to reflect actual physical market prices.

7.  The Brent Crude Oil prices Platts publishes, which include Dated Brent, are widely disseminated in the United States to Brent Crude Oil spot and futures traders, including Plaintiffs. Platts uses a "Market on Close" or "MOC" methodology to arrive at Brent Crude Oil Prices.  The MOC methodology is designed to capture the price of oil closest to the market, but the designated period when Platts assesses prices during the MOC is only thirty minutes in duration and generally involves very few market players.   If there are no trades, Platts uses bids or offers as an indicator of where market participants were willing to buy or sell.  To arrive at the Dated Brent price, Platts reviews various types of transactions for physical Brent Crude Oil or for derivatives of Brent Crude Oil, but only during the MOC process.  Platts then connects the various markets together to obtain the Dated Brent price. Platts' MOC method can be easily gamed by market participants that make false, inaccurate or misleading trades (or provide false bids and offers) during the MOC process (sometimes referred to as the "Platts Window").

8.  Defendants are major producers and market participants in the Brent Crude Oil market and during the Class Period had (and continue to have) market power and the ability to influence prices in the Brent Crude Oil and related markets.  As large market participants, Defendants have the market power and ability to push Dated Brent prices in a particular direction

by purposefully and selectively reporting false and misleading data for transactions.   BP and Shell each alone had the market power and ability to manipulate Dated Brent prices and price trends, and when acting with other Defendants their collusive market power and ability to manipulate Dated Brent prices was even greater and more disruptive to the market.   During the Class Period, Defendants deliberately reported inaccurate, misleading, and false information regarding Brent Crude Oil prices and transactions to Platts.   Defendants selectively reported bids, offers, "spoof" orders and transactions with aberrant pricing during a designated thirty-minute MOC window.   By providing false or inaccurate information and engaging in false or sham trading, Defendants undermined the entire pricing structure for the Brent Crude Oil physical and futures markets.   Among other things, Defendants knowingly participated in or accommodated prohibited wash sale transactions with one another, which they initiated with the intent to avoid taking a bona fide market position exposed to market risk.

9.   Plaintiffs detail herein concrete evidence of manipulation by all Defendants of prices during the Platts MOC window, including through significant transactions that caused artificial prices and artificial pricing trends during two specific periods – February 2011 and September 2012.   During these two periods, Defendants engaged in disruptive and manipulative trading during the Platts MOC window at least in part to benefit their Brent Crude Oil derivatives positions.

10.   IOSCO, an umbrella of global securities regulators, issued a report in October 2012 after examining, among other things, a number of price reporting agency ("PRA") assessment methodologies, including how oil spot market prices are assessed by Platts.   IOSCO's express focus was on the IOSCO members' responsibilities with respect to derivatives that are subject to their jurisdiction.   IOSCO concluded that the PRA system "creates opportunity to manipulate the

commodity market" and warned that the potential for misconduct in the oil market "is not mere conjecture." Specifically, IOSCO reported that:

> Situations susceptible to manipulation include those in which the volume of cash market transactions and/or the number of participants determining the cash-settlement prices are relatively low. Under such circumstances there could be the potential to manipulate or artificially influence the data from which the cash-settled price is derived or to exert undue influence on the cash-settlement price's computation in order to profit on a derivatives contract position in that commodity.

11. By purposefully reporting inaccurate, misleading, and false Brent Crude Oil trade information to Platts and manipulating the MOC process during the Class Period, Defendants manipulated prices and restrained trade in both the spot Brent Crude Oil market and the Brent Crude Oil futures market. The Brent Crude Oil futures market is inextricably linked to, and associated with, the spot market for Brent Crude Oil, and thus naturally by extension to Platts pricing. Consequently, a manipulation of the Platts Brent Crude Oil benchmarks has effects that flow through the Brent Crude Oil market.

12. Defendants' conduct during the Class Period drew complaints from other market participants and caught the attention of the European Commission ("EC"). In August 2012, Total Oil Trading S.A. ("Total Oil"), the Swiss trading unit of France's Total S.A., one of the world's largest oil companies, reported to regulators that "several times a year, estimates of market prices on key [energy] indices…are out of line with our experience of the day," warning of "inaccurate pricing."

13. Seven months later, on May 14, 2013, the EC carried out unannounced inspections of several companies in connection with concerns that "the companies may have colluded in reporting distorted prices to a price reporting agency to manipulate the published prices for a number of oil and biofuel products." In confirming the raids to the media, the EC commented that:

5

> The prices assessed and published by the Price Reporting Agencies serve as benchmarks for trade in the physical and financial derivative markets for a number of commodity products in Europe and globally. Even small distortions of assessed prices may have a huge impact on the prices of crude oil…potentially harming financial consumers.

14.   Further evidence of Defendants' wrongdoing is likely to become available based on governmental investigations.  After the EC confirmed on May 14, 2013, that it, along with the EFTA Surveillance Authority, had carried out unannounced inspections of several companies acting in and providing services to the crude oil, refined oil products, and biofuels sectors, on May 17, 2013, the U.K. Serious Fraud Office announced that it was "urgently reviewing" the EC's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation."  Then, on June 24, 2013, the media reported that the U.S. Federal Trade Commission "("FTC") opened a formal investigation into how prices of crude oil and petroleum-derived products are set.  The FTC investigation reportedly mirrors the EC inquiry into the pricing practices of energy markets.

15.   The European Commission undertook the inspections on concerns that: (i) the companies may have colluded in reporting distorted prices to a PRA to manipulate the published prices for a number of oil and biofuel products; and (ii) the companies may have prevented others from participating in the price assessment process, to facilitate the monopoly over price setting and to distort published prices.

16.   Defendants BP, Shell and Statoil have confirmed that they are subjects of the EC investigation.    In particular, Defendant Statoil confirmed that the inspection was carried out at the request of the EC, assisted by the Norwegian Competition Authority, and confirmed that the scope of the investigation was related to the Platts MOC price assessment process, used to report prices for crude and refined oil products. The foregoing investigations are expected to yield

information from Defendants' internal records (*e.g.*, instant messages, e-mails, telephone records, Brent Crude oil trading data, etc.) that provide further support for Plaintiffs' claims.

17.   Plaintiffs have been injured by paying artificial and anticompetitive prices for Brent Crude Oil futures contracts as a direct and proximate result of Defendants' unlawful conduct alleged herein.

## II.   JURISDICTION AND VENUE

18.   This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 22 of the CEA, 7 U.S.C. § 25.

19.   Brent Crude oil is a "commodity" and is the "commodity underlying" Brent Crude Oil futures contracts traded on ICE and NYMEX, as those terms are defined and used in Sections 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

20.   This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 US.C. §§ 15(a) and 26, Section 22 of the CEA, 7 US.C. § 25 and 28 US.C. §§ 1331 and 1337.

21.   Venue is proper in the Southern District of New York, pursuant to 15 U.S.C. § 15(a), Section 22 of the CEA, 7 US.C. § 25(c) and 28 US.C. § 1391(b), (c) and (d).   Defendants transacted business in the Southern District of New York, the claims arose in this District, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.   Platts is a division of McGraw Hill Financial, Inc., which also has its headquarters in New York, New York.   The Dated Brent and Brent Crude Oil price assessments published by Platts are widely disseminated in the U.S. to Brent Crude Oil physical and futures traders, including Plaintiffs, located in the U.S.

22. Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the U.S. Mail in connection with the unlawful acts and practices and courses of business alleged in this Complaint. Brent Crude Oil and related futures contracts are commodities that trade in interstate commerce in the U.S. Defendants are all sophisticated Brent Crude Oil market participants that knew that Platts' and other PRAs' price assessments for Dated Brent and Brent Crude Oil are disseminated in the U.S. and are incorporated into the trading and settlement prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the U.S.

## III.   PARTIES

### A.   Plaintiffs

23. Plaintiff Kevin McDonnell ("McDonnell") is an individual residing in the State of New York. During the Class Period, McDonnell operated as an independent floor trader on NYMEX, trading for his own account, and served as a director of NYMEX Holdings, Inc. McDonnell also served as a member of the Executive Committee of NYMEX and has held various executive and committee positions, including Treasurer and Chairman of the NYMEX crude oil advisory committee, and he served on the membership, finance, floor and settlement committees. McDonnell repeatedly traded in Brent Crude Oil futures contracts, both on NYMEX and ICE, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. McDonnell also traded on multiple occasions on the NYMEX in open outcry trading pits in New York, as well as on electronic platforms. By paying artificial and anticompetitive prices for these crude oil futures contracts, McDonnell was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

24.  Plaintiff Anthony Insinga ("Insinga") is an individual residing in the State of New York.  During the Class Period, Insinga operated as an independent floor trader on NYMEX, trading for his own account.  Insinga served on the NYMEX Floor Committee and Adjudication Committee.  Insinga repeatedly traded in Brent Crude Oil futures contracts, both on NYMEX and ICE, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Insinga also traded on multiple occasions on the NYMEX in open outcry trading pits in New York, as well as on electronic platforms. By paying artificial and anticompetitive prices for these crude oil futures contracts, Insinga was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

25.  Plaintiff Robert Michiels ("Michiels") is an individual residing in the State of New Jersey.  During the Class Period, Michiels operated as an independent floor trader on NYMEX, trading for his own account.  Michiels repeatedly traded in Brent Crude Oil futures contracts, both on NYMEX and ICE, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Michiels also traded on multiple occasions on the NYMEX in open outcry trading pits in New York, as well as on electronic platforms. By paying artificial and anticompetitive prices for these crude oil futures contracts, Michiels was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

26. Plaintiff John Devivo ("Devivo") is an individual residing in the State of New York. During the Class Period, Devivo operated held a seat on NYMEX and traded for his own account. Devivo repeatedly traded in Brent Crude Oil futures contracts on NYMEX, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint

of trade as alleged herein.  Devivo also traded on multiple occasions on the NYMEX in open outcry trading pits in New York, as well as on electronic platforms. By paying artificial and anticompetitive prices for these crude oil futures contracts, Devivo was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

**B.    Defendants**

27.   Defendant Royal Dutch Shell p.l.c.

**a.**   Royal Dutch Shell p.l.c. (formerly defined as "Shell") is a multinational group of energy and petrochemical companies which is headquartered in The Hague, Netherlands.  Shell also maintains offices in the United States, including in Houston, Texas.

**b.**   Shell is organized as a public company under the laws of England and Wales. The shares of Shell are traded on the New York Stock Exchange.

28. Defendant BP p.l.c.

 **a.**   BP p.l.c. (formerly defined as "BP") is a major international energy company which is headquartered in London, England.  BP also maintains offices in the United States, including in Houston, Texas, Naperville, Illinois and Anchorage, Alaska.

**b.**   BP is organized as a private limited company under the laws of England and Wales.  The shares of BP are traded on the London Stock Exchange and the New York Stock Exchange.

29.   Defendant Statoil ASA.

a.   Statoil ASA ("Statoil") is a Norwegian oil and gas company that engages in the exploration, production, transportation, refining and marketing of petroleum and petroleum-derived products.  Statoil is headquartered in Stavenger, Norway and also maintains offices in the United States, including in Stamford, Connecticut, Washington D.C. and Houston, Texas.

b.   Statoil is a public limited company organized under the laws of Norway.  Shares of Statoil ASA are traded on the New York Stock Exchange.

30.   Defendant Morgan Stanley.

a.   Defendant Morgan Stanley ("Morgan Stanley") is a market leader in energy and metals trading worldwide and trades actual physical commodities as well as associated derivatives and futures.  Morgan Stanley is a corporation organized under the laws of Delaware with its principal place of business located in New York, New York.  Shares of Morgan Stanley are traded on the New York Stock Exchange.  As Morgan Stanley's 2012 Form 10-K states: "Morgan Stanley is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals."

31.   Defendant Trafigura.

a.   Defendant Trafigura Beheer B.V. ("Trafigura Beheer") engages in the sourcing and trading of crude oil, petroleum products and other products for industrial consumers worldwide and holds itself out as one of the world's leading commodity traders.  Trafigura Beheer is the parent company of the Trafigura Group, which is incorporated in the Netherlands and is subject to Dutch law.  Trafigura is managed and controlled from Amsterdam and maintains 81 offices in 56 countries, including offices in the United States located in Houston, Texas, and in Stamford, Connecticut.

b.   Defendant Trafigura AG is a wholly-owned subsidiary of Trafigura Beheer and is organized under the laws of Switzerland.  In the U.S., Trafigura Beheer's operations are owned and managed by Trafigura AG, which operates oil and petroleum product trading out of Houston, Texas.  Trafigura Beheer and Trafigura AG are together referred to herein as "Trafigura."

32.   Defendant Phibro Trading LLC.

a.   Phibro Trading LLC ("Phibro") is an international commodities trading firm that is headquartered in Westport, Connecticut and engages in energy trading primarily in liquid markets over exchanges, in addition to over-the-counter physical, swaps and options markets.

b.   Phibro is a limited liability company organized under the laws of Delaware and is a subsidiary of Occidental Petroleum Corporation, a publicly traded Delaware corporation, whose shares trade on the New York Stock Exchange.

33.   Defendant Vitol.

a. Vitol, S.A. ("Vitol") is a privately owned international energy and commodities firm that maintains headquarters in Geneva, Switzerland.  As described on the company's website, "trading is the engine of [Vitol's] business," and the company trades crude oil on a global basis.  Vitol's U.S. affiliate, Vitol, Inc., a Delaware corporation, maintains a principal place of business in the Houston, Texas.

**C.   John Doe Defendants Nos. 1-50**

34.   Defendants colluded with others to submit a contrived picture of Defendants' prices and transactions.    The John Doe Defendants are other persons or entities whose identities are currently unknown to Plaintiffs.  The John Doe Defendants themselves independently performed or participated in, combined, conspired and/or agreed with others to perform the unlawful acts alleged herein, including the manipulation of the prices of Brent Crude oil and Brent Crude oil futures contracts, and illegal restraint of trade.

**D.   Agents and Unnamed Co-Conspirators**

35.   Various other persons, firms, corporations, or joint ventures not named as Defendants in this lawsuit, the identities of which are presently unknown, participated as co-conspirators with each of the Defendants in their illegal activities alleged in this Complaint and

have performed acts and made statements in furtherance of the illegal combination and conspiracy.

IV.     SUBSTANTIVE ALLEGATIONS

    A.     Glossary of Key Terms

36.     "Backwardation" refers to market conditions in which the price of a commodity for nearby delivery is higher than for the more deferred deliveries. *See infra* ¶ 72.

37.     "Brent Crude Oil" refers to oil that originates in the North Sea and includes the four crude oil grade blends deriving from different North Sea oil fields:   "Brent", "Forties", "Oseberg" and "Ekofisk" (collectively, "BFOE").   Defendant BP operates the Forties field; Defendant Shell operates the Brent field; and Defendant Statoil operates the Oseberg field. *See* ¶¶ 54-56.

38.     "Cash BFOE" refers to forward contracts that involve over-the-counter ("OTC") trades for future months beyond the Dated Brent 10 to 25 day window.   Cash BFOE trades theoretically represent the value of BFOE in a forward month beyond the current month.   Cash BFOE trades technically can be converted into physical cargo, but typically are cash settled. *See* ¶¶ 84-85.

39.     "Contango" refers to market conditions where the price of a commodity for nearby delivery is lower than for more deferred deliveries. *See infra* ¶¶ 72.

40.     Contract for Differences ("CFD") is a relatively short–term swap, quoted by Platts for each of eight weeks ahead of the current date at any one time.   A Contract for Differences is a swap for theoretically 100,000 barrels of Brent Crude Oil, but settles on a cash basis as a differential to Cash BFOE.   CFDs are traded for weekly, bi-monthly and monthly periods in the marketplace. *See* ¶¶ 77-83.   The average price of CFDs during the 10 to 25 (or 21) Dated Brent window is the North Sea Dated Strip.

41.  "Daisy Chain" here refers to the practice of passing the same Brent cargo related uniquely to a single set of cargo dates through a paper chain involving a sequence of transactions among various sellers and buyers.  *See* ¶ 149.

42.  "Dated Brent" is a benchmark assessment of the price of physical, light North Sea crude oil that is published by Platts.  The term "Dated Brent" refers to the physical cargoes of crude oil in the North Sea that have been assigned specific delivery dates 10 to 25 (formerly 21) days in the future.  *See* ¶¶ 67-76.  Platts' Dated Brent benchmark, which acts as a pricing guide for most of the world's crude oil, is determined by Platts using prices for Cash BFOE, CFDs and the North Sea Dated Strip.

43.  "Differential" refers to the discount or premium between a given Brent market price and the flat price.  Differential prices off of the benchmark Cash BFOE for Brent Crude Oil are affected by the quality and demand for a particular blend of BFOE product.   As discussed below, Dated Brent is priced based on the most competitive (*i.e.*, the lowest) price reported by Platts of the BFOE North Sea product streams, measured as a differential from the North Sea Dated Strip. *See infra* ¶¶ 87-90.

44.  "Dubai Crude" refers to Dubai Crude Oil, which is also known as Fateh, is a grade of crude oil that is used as a benchmark in oil pricing.  *See infra* ¶ 186.

45.  "Flat Price" refers to the total price of a particular commodity.  As discussed below, Cash BFOE acts as the flat price benchmark to the CFDs.  *See infra* ¶¶ 86.  The average of the CFD prices during the Dated Brent 10 to 25 day window will determine the base flat price that becomes the North Sea Dated Strip, which serves as the flat price that is used to calculate Dated Brent.  *See infra* ¶¶ 87-90.

46.  "Market-on-Close" or "MOC" is the methodology employed by Platts since 2002 that limits the analysis of pricing data to transactions that occur during the last half an hour of the trading day.  Each trading day, Platts calculates Dated Brent by analyzing trades occurring between 4:00 p.m. and 4:30 p.m. London time.  This window is referred to as the "Platts Window."  *See* ¶¶ 68-71.

47.  "North Sea Dated Strip" is defined as a flat price measure of the average price of CFDs during the 10 to 25 (or 21) Dated Brent window.  North Sea Dated Strip acts as the flat price against which BFOE cargoes in the 10-21 day window are priced. *See* ¶¶ 87-88.  Dated Brent is the most competitive of the BFOE crude oil streams, measured as a differential to North Sea Dated Strip.

48.  "Spoofing" refers to the disruptive trading practice of bidding or offering with the intent to cancel the bid prior to executing the trade.  *See infra* ¶¶ 111, 142, 177.

49.  Urals ("Urals") is a grade of crude oil that is used as a benchmark in oil pricing.  *See infra* ¶ 189.

50.  "Very Large Crude Carriers" ("VLCCs") refers to oil tankers that are capable of transporting between 1 and 2 million barrels of crude oil.  *See infra* ¶ 105.

51.  "Wash Trades" refers to the disruptive trading practice of entering into offsetting transactions, designed to give the appearance that bona fide purchases and sales have been made, without incurring market risk or changing the trader's market position.  *See infra* ¶ 172.

52.  "WTI" refers to West Texas Intermediate crude oil, which is also known as Texas light sweet, is a grade of crude oil that is used as a benchmark in crude oil pricing.  *See infra* ¶ 57.

53.  "Wet Contracts" refers to those Brent contracts that turn into specific Dated Brent delivery contracts with respect to the contract delivery month in question.  *See infra* ¶¶  64, 216.

B.      **Brent Crude Oil**

54.   Crude oil is refined into products like gasoline, diesel, jet fuel and more.  "Brent Crude Oil" is oil originating in the North Sea and includes the four North Sea crude oil grade blends: Brent, Forties, Oseberg and Ekofisk.  Collectively, these blends are referred to as Brent Crude Oil.  Brent Crude Oil serves as an international benchmark grade of crude oil.

55.   The Brent Crude Oil physical market consists of trades in cargoes of the four BFOE North Sea streams of crude oil.

56.   Brent Crude Oil is the leading global price benchmark for Atlantic basin crude oils.  Moreover, Brent Crude Oil is used to price at least two-thirds of the world's internationally traded crude oil supplies.

57.   The other well-known classifications (also called references or benchmarks) are the OPEC Reference Basket, Dubai Crude, Oman Crude, Urals and West Texas Intermediate ("WTI").

58.   Defendants Shell, BP, and Statoil are each individually among the largest producers of BFOE.  Defendants Shell, BP and Statoil are major producers of Brent Crude Oil.  Defendants control the sales points for three of the four areas used for Brent pricing: Brent, Forties, Oseberg, and Ekofisk; Defendant Shell operates the Brent field; and Defendant Statoil operates the Oseberg field.

59.   The average North Sea crude oil output is currently around two million barrels per day ("bpd") and the BFOE basket comprises an approximate one million bpd (around 700,000 bpd during the 2012 summer maintenance period).

C.      **Price Reporting Services/Platts**

60.   Price reporting agencies (previously defined herein as "PRAs") publish benchmark prices that are used globally to determine the price refiners pay for crude oil.  As much as 80% of

all crude and oil product transactions are estimated to be linked to reference benchmark prices published by Platts, which is the world's leading energy price reporting company and the premier source of benchmark price assessments for commodity markets. Platts is a division of McGraw Hill Financial, Inc.

61. Platts is the preeminent PRA that assesses and reports on prices in the physical Brent Crude Oil market.

62. Transactions in the Brent Crude Oil physical markets are based on over-the-counter ("OTC") contracts between oil producers, traders and refiners, often using private brokers as intermediaries. Therefore, oil prices are not directly visible to the public, but rather are assessed and reported by PRAs. To obtain data, Platts and other PRAs rely upon transactions by Defendants and others in the opaque OTC market. PRAs collect and disseminate the reported data to participants in the physical and futures market for crude oil commodities.

63. Platts has enormous financial incentives to include the trades of Defendants, especially of BP and Shell, since they are significant sources of revenue to Platts, as is the assessment of the BFOE complex itself. Were Platts to determine that either Shell or BP were engaged in manipulative activity: a) Platts would have to exclude BP and Shell from the BFOE assessment process (MOC) for some considerable period of time which would, given the dominance of BP and Shell in the MOC, render their quotations for that period hollow, and b) then BP and Shell may react to a Platts ban by withdrawing from the MOC then the very existence of the Platts Crude Oil Marketwire, Platts' flagship and highly lucrative publication, would itself be called into question. BP and Shell hold Platts hostage. Platts has enormous incentive to ignore the implications of manipulative trades and to attempt to justify them.

**D.** **The Brent Benchmark**

64.   Platts reports prices for various submarkets in the overall Brent Crude Oil market. These include the submarkets termed: "Brent," "Dated Brent," "Cash BFOE" or "Forward Dated Brent," "North Sea Dated Strip," and CFDs.   Platts' Dated Brent is a benchmark assessment of the price of physical, light North Sea crude oil.  The term "Dated Brent" refers to wet, physical cargoes of crude oil in the North Sea that have been assigned specific delivery dates.

65.   The primary benchmark for Brent Crude Oil is Dated Brent.  As discussed more fully below, Platts incorporates a complex pricing methodology incorporating the different prices – Cash BFOE, North Sea Dated Strip, and CFDs, to arrive at the Dated Brent benchmark price.

66.   For pricing the Dated Brent, Platts will only consider the prices of BFOE cargoes in its dated assessment window that are for lifting dates between 10 and 25 days forward of the assessment date.  Prior to January 2012, this assessment window was for lifting dates between 10 and 21 days forward. Thus, the benchmark is at least theoretically derived from the value of crude oil in forward dates (*i.e.*, physical cargoes of crude oil in the North Sea that have been assigned a specific date to be loaded onto a tanker) and these forward dates are within a close time proximity from the time of the execution of the contract.  Typically, Dated Brent requires a loading of a cargo within a 3-day period.

67.   Platts assesses Brent Crude Oil contracts based on the most competitive price of any four grades of crude oil.  Platts does not average the price of Brent, Oseberg, Forties and Ekofisk to set its benchmark rate.  The most competitive grade at the margin will determine the price for the Dated Brent – as a differential to Platts' North Sea Dated Strip assessment.  For the most part, due to quality differences, the Forties stream is typically the most competitive of the four grades.

68.   To arrive at its assessments of the various pricing pieces for Dated Brent (Cash BFOE, North Sea Dated Strip and CFDs), Platts uses a market-on-close or MOC methodology,

which limits its analysis of market pricing data to transactions that occur during a half-hour window at the end of the trading day (commonly referred to as the "Platts Window"). Platts first introduced the MOC methodology in 2002, and price assessments are based on bids, offers and transactions during a half-hour period at the end of each trading day, which, for Brent Crude Oil, is between 4:00 p.m. and 4:30 p.m. London time. The MOC is time stamped at 4:30 pm and is supposed to lead, through bids and offers and done deals, to a price.

69. Platts aims to capture the price of oil closest to the market, but Platts' MOC method can be easily gamed by market participants who can make false, inaccurate or misleading trades (or provide false bids and offers) during the MOC. If there are no trades, bids or offers are used as an indicator of where market participants were willing to buy or sell. Large market participants have had the market power and ability to push Dated Brent prices in a particular direction by purposefully and selectively reporting false and misleading data for transactions during the last seconds before the 4:30 p.m. close of the Platts Window.

70. The economic logic for trading during the Platts window is problematic. The reality of the market is that trades of Brent Crude Oil occur throughout the course of the day. Therefore, it makes little sense for a trader with a position, let alone a large position (either long or short), to use the stylized MOC process to offset the position. This is because there are fewer players involved in the MOC process and less time to make bids and offers. To try to buy or sell large positions at the MOC generally is uncommon because to do so telegraphs that the trader held a large position and wanted to offload it. A more economically-rational strategy for a trader with a large position would be to unload it slowly over a longer period, not quickly in the narrow MOC window.

71.   In addition, the Platts assessment for the MOC for Dated Brent is only for the circumscribed 10 to 21 (now 25) day forward window.  This means that trades outside this range do not factor into the price calculation that Platts uses.  And because it is sometimes hard to obtain freight on short notice, if the market for Dated Brent for loading in the 10 to 13 day forward period is offered at very low levels, it may still be impossible for buyers to capitalize on the lower prices.   For this reason, the MOC window is easy to manipulate downward, particularly in situations of tight freight supply.

72.   Platts factors into the assessment process for Dated Brent backwardation, which occurs when futures contract prices are less than the expected future spot price, and contango, which occurs when futures contract prices are greater than the expected future spot price.  If a company offers a cheap cargo loading 10 days forward, the offer only influences, at the most, the Platts assessment for cargoes loading 10 days forward.  Platts still needs to assess days 11 through 25 and publish an assessment that is inclusive of market value from 10 to 25 days forward.  (The range stretches to 27 days for Friday assessments.)  If Platts assesses the market in contango, then the price of Dated Brent will be higher later in the period.  If it assesses Dated Brent in backwardation, then later in the period the price of Dated Brent will be lower than in the earlier period.  Platts will average the price of Dated Brent when the market is in contango or backwardation to come up with a single benchmark price for the two-week window.  By pushing the nearby, 10-day forward loading window upward or downward, a trader can manipulate the market into backwardation, or contango.

73.   The North Sea Dated Brent benchmark that Platts publishes sets the price of a majority of the world's crude oil, from Canada to Australia.

74.   As discussed, the Platts' Dated Brent assessments are set from actual transactions, as well as bids and offers for Brent Crude Oil.  Dated Brent is based on cargo sizes of BFOE (e.g., 600,000 barrels) with actual loading times, and therefore it is intended to reflect actual physical market prices.  Dated Brent cargoes are for crude oil, loaded free on board (FOB) from one of the BFOE terminals and may include stored material at each location.  The buyer of a FOB Brent Crude Oil cargo must supply its own freight to transport the cargo from the North Sea to its ultimate location – which could be the United States, Northern Europe, the Mediterranean, Asia, or elsewhere.

75.   The loading schedule for cargoes in the BFOE blends is limited by capacity constraints.  For example, it would not be possible for many cargoes of the Forties blend to be loaded during the same three-day Dated Brent window from the same of the four North Sea sources. In part to address these capacity constraints, the Platts system permits ship-to-ship loading in addition to loading at the BFOE points.  As discussed below, ship-to-ship loading can also be used as a way to manipulate the market.

76.   Most of the Brent Crude Oil trades use a reference source to determine the price, rather than a so-called flat price.  For example, rather than using a flat price of $90.00 per barrel for Brent Crude Oil, purchase and sale contracts reference Cash BFOE as a benchmark price "plus" or "minus" a further amount in order to reflect grade, delivery location, processing or refining improvements, or other costs.  For Brent Crude Oil pricing, such as CFD pricing (as discussed below), this difference between a given Brent market price and the benchmark price is known as a differential.  These differential prices for the Brent Crude Oil physical markets are supposed to represent the more narrow supply and demand dynamics of that submarket, while the flat benchmark price usually reflects the broader forces that influence prices generally.  Thus,

for example, the benchmark price could rise greatly because of some geopolitical issue, while the differentials for Dated Brent might decrease because an oversupply of one of the BFOE products coupled with a reduction in demand for that particular blend.

### 1.  Contract for Differences

77.  To arrive at the Dated Brent price, Platts reviews various types of transactions for physical Brent Crude Oil or for derivatives of Brent Crude Oil, but only during the MOC process. Platts then connects the various markets together to obtain the Dated Brent price.

78.  Brent CFDs are relatively short–term swaps, quoted by Platts for each of eight weeks ahead of the current date at any one time.  They also are traded for bi-monthly and monthly periods in the marketplace.  They represent the market differential in price between the Dated Brent (BFOE) assessment and a forward month cash contract, i.e., forward month BFOE cash contract, over the period of the swap.

79.  The first weekly balance is on a forward week basis on Thursday and Friday, and becomes a balance week quotation between Monday and Wednesday.  It is rolled forward every Thursday.  Second week onward assessments are all forward week assessments.  Assessments are quoted as a differential to the second Cash BFOE contract month.  For example, on July 23rd, the assessment is against September cash BFOE.  The relevant cash month rolls on the first day of each month.  For example, June will become the basis month on April 1.

80.  CFDs are a means for holders of long or short BFOE cash positions to hedge against or speculate in movements in the Dated Brent market.  The CFD swap is between the uncertain or "floating" price of the dated Brent differential and a certain or "fixed" differential price, which generally is Platts' daily dated Brent crude assessment.  CFDs are priced using averages of a particular week's worth of daily price assessments as quoted by Platts.

81. Each trade is an exchange of a fixed for a floating risk in the Dated to BFOE cash differential. CFDs' role in pricing Dated Brent is described more fully below.

82. CFDs are generally traded in clips of 100 lots, i.e., 100,000 barrels. In addition to Dated Brent, CFDs are also used to price crudes which are sold at a differential to Dated Brent.

83. CFDs are used by traders to approximate the Brent Crude Oil physical market. However, the CFD product is not actually physical crude oil, like the product in the futures market, but rather it is a derivative instrument that is priced based on the Platts benchmark prices. Traders with information about market movements can leverage their knowledge by trading larger volumes in the CFD market and the futures market. The settlement of CFDs is purely for cash. Platts reports CFD trades and prices in the MOC assessment. The Brent Crude Oil futures market is inextricably linked to the spot market for Brent Crude Oil, and consequently to Platts pricing. Therefore, price movements in the spot market cause price movements in the futures market.

### 2. Cash BFOE

84. Although the nomenclature is not always employed consistently, the Cash BFOE market is also reported by Platts in the MOC window. This market consists of trades of BFOE in 100,000 barrel units. Cash BFOE trades as a forward contract for future months beyond the Dated Brent 10 to 21 (now 25) day window.

85. Cash BFOE is theoretically the price of BFOE in a forward month beyond the current month. Like CFDs, trades in Cash BFOE are a derivative, quasi-physical market in the sense that the trades are normally cash settled. Cash BFOE trades can be accumulated, however, and under certain circumstances, may be converted into a cargo if a 600,000 barrel amount is accumulated with the same counterparty.

86.   As discussed above, CFDs are priced as a differential to the Cash BFOE market. The Cash BFOE acts as the flat price benchmark to the CFDs.

### 3.  North Sea Dated Strip

87.   The North Sea Dated Strip is not a traded instrument.  Rather North Sea Dated Strip is the average of the CFD prices, expressed as a flat price, not a differential, during the 10 to 21 (or 25) day MOC Dated Brent window.  The four prices of BFOE are measures as a differential against the single North Sea Dated Strip price.   As discussed below, that North Sea Dated Strip flat price is determined by the CFD market.

88.   The Dated Brent on a given day is the lowest price reported by Platts of the four North Sea product streams, measured as a differential from the North Sea Dated Strip.

### 4.  Interrelationship Between the Various Platts Prices

89. Platts uses the pricing relationships between Cash BFOE and CFDs solely from the MOC process to arrive at the final Dated Brent benchmark price, which affects the majority of crude oil transactions worldwide.

90.   The average of the CFD prices during the Dated Brent 10 to 21 (now 10 to 25) day window will determine the base flat price that becomes the North Sea Dated Strip.  Then, the most competitive (i.e., lowest) North Sea Dated Strip product stream will determine the differential which becomes Dated Brent.

91.   As discussed herein, Defendants engaged in various forms of manipulation of the MOC process, which resulted in an artificial Dated Brent, and therefore artificial futures prices. Several examples are provided below.

### E.  The February 2011 Manipulation

92.   In February 2011, Defendant Shell manipulated the CFD and Dated Brent Crude market and thereby harmed futures traders, including Plaintiffs.  Although the MOC process is a

short time period and market participants are well acquainted with each other and can transact outside of it, Shell manipulated the MOC process to dictate pricing in the MOC in order to advantage its trading positions, particularly nearby CFDs and forward month Cash BFOE.

93.   Shell suppressed nearby CFD and Dated Brent prices in order to advantage a large short position that it had in the CFD and likely also the futures markets.  By the end of the month, Shell was able to do this by engaging in trades designed to manipulate prices during the short MOC window, which set the prices for Dated Brent and related markets.  The artificiality of the prices at which Shell traded is highlighted by observing that physical cargo trading outside the Platts MOC assessment period traded at significantly higher prices than those Shell was reporting.

94.   The vagaries and manipulability of the Platts reporting system was evident early in the month.  On February 8, 2011, Platts assessed the Dated Brent quotation at $99.055.  This was derived from a calculated North Sea Dated Strip of $99.425 less a Forties discount (Forties, being the weakest grade of BFOE, set the assessment) of $0.37.  Platts raised the value of Forties, relative to North Sea Dated Strip, by $0.08 from February 7 to February 8, 2011.

95.   On this date, there were no Dated Brent cargo trades in the Platts MOC assessment period.  The assessment period for February 8, 2011, being 10 to 21 days forward from the record date, was February 18, 2011 to March 1, 2011, with a middle point of February 23 to February 24, 2011 at which dates the Dated Brent assessment should be made according to the methodology.

96.   There was only one Dated Brent cargo bid in this MOC process, which was a bid by Vitol for Forties on loading dates of February 27 through March 1, 2011 at a price of Dated Brent minus a $0.35 per barrel discount.

97.   There was one Dated Brent cargo offer in this MOC process being an offer from Chevron for Forties on loading dates of February 23 through February 25, 2011 at a price of Dated Brent plus a $0.30 per barrel premium.

98.   In setting the Dated Brent assessment for this day, and in arriving at an assessment of a discount of $0.37, Platts took account only of the low nature of the bid from Vitol and further lowered its assessment by $0.02 to reflect a contango price structure existing between the middle of the Platts assessment period and the Vitol bid dates.

99. Platts took no account in the assessment for the day of the Chevron offer at a premium of $0.30 despite the fact that this offer was for the dates precisely in the middle of the Platts assessment period.

100.   Platts further ignored trades that were made, at least in part, just outside the Platts Dated Brent 10 to 21 day period. These transactions were that PetroCanada sold the March 2-4 Forties cargo at a value of cargo around the North Sea Dated Strip plus $0.30/b.  This value was described by one source as "nothing to do with 10-21- day window value."  In addition, a March 1-3 cargo was sold by Nexen for reportedly a similar number to that of the PetroCanada March 2-4 cargo.  The reason that this value had "nothing to do with" the MOC process was because Platts refused to consider trades that might reflect fundamental values outside of the rarefied and artificial MOC bubble, which was easily manipulated.

101.   The trades, which occurred outside of the MOC, whereby PetroCanada sold a Forties cargo for loading March 2 through March 4, 2011 at a premium of approximately $0.30 and Nexen sold a Forties cargo for loading 1st to 3rd March at a premium in the region of $0.30 (conservatively) and only just outside of the assessment period, verify that the Chevron offer, made inside the assessment period and in the MOC process, of a Forties cargo loading February

23 through February 25, 2011 at a premium of $0.30 was closer to fair market value than the assessment made on the Vitol bid.

102.    Platts produced an assessment on February 8, 2011 for Forties, which was at least $0.60 under the value of the more transparent and discoverable price.  In this way, Defendants, through the Platts MOC process, contributed to an artificially low price for Forties.

103.    Activity both inside and outside the MOC period suggested that the assessment for Forties relative to North Sea Dated Strip should have been (approximately) at a premium to North Sea Dated Strip of $0.30.   Pricing on this day evidences that Platts can be highly subjective and easily manipulated by anecdotal market values.

104.    Shell and Morgan Stanley's manipulation of the Brent Crude Oil market through the Platts MOC process occurred most directly in the latter half of February 2011.  Coming into the end of February 2011, Shell had a large short CFD position in the very nearby dates.  This position would have been significantly benefitted by maintaining a low price in the Dated Brent and other markets on the pricing dates for those very nearby CFD positions.  Since as early as February 3, 2011, Shell had sold about 2 million barrels in the end-of day OTC market and during the MOC assessment process combined.  Shell also sold the nearby CFD and Dated Brent as spreads against purchases of BFOE Cash in later months, like April and May.  Shell was also accumulating, in conjunction with Morgan Stanley, a dominant position in Forties cargoes in more forward dated positions.

105.    Shell's total nearby short position may well have been considerably larger than that known to market participants.  In addition, Shell was either accumulating large quantities of prompt physical oil, or posturing to the market that it was accumulating large quantities of

prompt physical oil, on Very Large Crude Carriers ("VLCCs"), which are a type of cargo ship that can hold 1 to 2 million barrels of crude.

106.    Shell used these accumulations of floating physical oil as a threat hanging over the Brent Crude Oil market.  If the VLCCs were used as freight and traded away out of the region, then supply would be reduced and prices would rise.  If they were used as floating storage which delivers into the region, then supply would be increased and prices would fall.  These accumulations of oil, coupled with hugely dominant positions in all components of those markets used to set the Dated Brent prices, allowed Shell to move the relative value of Dated Brent at its will, and confounded other market participants.

107.    Shell at all times refused to publicly comment on its intentions.

108.    Given this overall trading position, Shell stood to profit from depressed prices in nearby CFDs and Dated Brent, and relatively higher prices in 21 Day BFOE, Cash BFOE and other Brent related contracts in forward periods.  In the parlance of the trade, Shell would benefit from a steeper contango.

109.    Throughout the month, Morgan Stanley followed Shell's trading and helped Shell set the price in the MOC window.  On February 15, 2011, Shell bought a cargo for Forties from Morgan Stanley at minus $0.05 per barrel to the North Sea Dated Strip, which set the price for Dated Brent on that day.  The price was inexplicable to traders at the time and was reported to be significantly above the market.  Such a trade is only explicable if it is to benefit a very prompt pricing, requiring a temporarily single high price quote, by either Shell or Morgan Stanley.  Shell would not publicly trade such a high price, given the large size of its known position, unless it were for purposes of a temporary price spike which Shell knew it could reverse at the time its large short position began to price long.

110.    Shell's trade on February 15, 2011, was not economically sound and was a demonstration of both Shell's exercising manipulative monopoly power and of its collusion with Morgan Stanley.   Moreover such injections of violent price changes are of great detriment to unsuspecting traders in both the physical and derivatives markets.

111.    Shell's short CFD position began pricing on February 21, 2011.  On that day Shell put "spoof" orders into the market on close by offering four cargoes, that is, 2.4 million barrels of oil.  Shell offered cargoes only for nearby dates in the Dated Brent 10 to 21 day window.  It was significantly more difficult for buyers to find freight for these nearby FOB positions so buyers were unable to execute trades on these offers.  Shell offered cheap nearby dates only, at manipulatively low prices.

112.    Shell offered these four Forties cargoes at minus $0.40.  Morgan Stanley was the only buyer for one of the cargoes.  Plaintiffs allege that the trade between Morgan Stanley and Shell was prearranged to set a low price for Dated Brent.  The plan was successful.  Although other traders were bidding for dated Bent at more aggressive levels at the back end of the 10 to 21 day window, Platts assessed the Forties differential to the North Sea Dated Strip at minus $0.30.  Shell's trade to Morgan Stanley successfully drove the Forties assessment lower than where it otherwise would have been, and allowed Shell to obtain a very low (and presumably profitable) price for its short CFD position.

113.    If Shell had truly wanted to sell four cargoes, it would have done so in large part outside of the MOC 30-minute period.  However, the purpose was not to trade the cargoes, but to pressure the market downward.  Shell sold the one cargo only to Morgan Stanley, a party to this collusion with coincident interests.  This cargo sale moved the market in favor of the large short CFD position Shell maintained.  This manipulative activity was not detrimental to Shell's

floating physical position because the contango market structure mitigated the effect of the low nearby prices.

114.    Shell's expertise allowed it to know the exact freight situation for its offered trading dates.  Therefore, Shell could not have been surprised when a third party took advantage of Shell's artificially low offers to sell.  The only possible buyer was Morgan Stanley, which, in collusion with Shell, had either real freight pre-arranged or had an agreement to transact, effectively, as a wash trade in either Dated Brent or another market (or "other markets").

115.    On February 21, 2011, Shell held nine Forties cargoes for loading during the period between March 2 through March 16, 2011.  Morgan Stanley held three cargoes for this period.  If Shell truly had wanted to sell cargoes, it could have done so to bids from other market players at the back end of the Dated Brent 10 to 21 day window.  Instead, however, it chose to offer the cargoes for quick loading.  In this light, Shell's trade to Morgan Stanley is evidence of a manipulation of the Dated Brent and other MOC prices downward.

116.    Shell was also able to manipulate the market downward by reporting to the market that it had contracted a VLCC (and according to reports may or may not have contracted more than one VLCC), which is a type of cargo ship that can hold 1 to 2 million barrels of crude.  Throughout the latter part of February, Shell was able to control the prices for Dated Brent by threatening to use crude on this ship to increase its capacity to load out cargo.  Other market participants were unable to anticipate whether Shell, whose trading prices appeared uneconomic, would be using the cargo to pressure the market downward, through ship-to-ship loading in the Dated Brent window or through delivery locally, or to pressure the market upward by shipping the VLCC out of the North Sea.  In a backwardated market, in which prices nearby are higher

than prices later on, it would have made economic sense for Shell to load out the VLCC immediately.

117.    Shell's plans to advantage this short CFD position were in part upset by events in Libya which the oil market interpreted as leading to restrictions in supply and thus higher Forties differentials to North Sea Dated Strip.  Thus, on February 23, 2011, Platts assessed the Forties differential relative to North Sea Dated Strip plus a premium of $0.16 per barrel (this set the Dated Brent quotation for the day).

118.    However, despite the supportive geopolitical events occurring, Shell strongly continued its manipulative conduct on February 24, 2011.  On that day Shell controlled the pricing for the entire Platts reporting structure of Brent Crude Oil.

119.    On February 24, 2011, the Platts Dated Brent quotation was determined in the Platts MOC process with a price set at 4:30 p.m. London time as calculated from conforming activity in the Platts MOC.  The assessment period at this time was for activity with dates from the 10 to 21 day forward period from the MOC date (with recognition of weekends).

120.    Dated Brent is calculated as the lowest price of the North Sea Dated Strip quotation plus or minus the premium or discount for each grade of BFOE.

121.    North Sea Dated Strip is calculated from trades, or estimates of traded levels, during the Platts MOC for forward Cash BFOE contracts, which are then adjusted for MOC trades for CFDs, or estimates for MOC trades for CFDs, which will reflect the 10 to 21 day forward period that the Dated Brent quotation is supposed to reflect.

122.    Once North Sea Dated Strip is calculated it is then adjusted to reflect the premium or discount applicable peculiarly to each of the grades of BFOE. The lowest absolute price at this time sets the Dated Brent quotation for that day.

123.    On February 24, 2011, the Cash BFOE contract applicable to the calculation of North Sea Dated Strip was the April Cash BFOE contract.  The following trades took place in the MOC:

| Cash BFOE Trades | | | | |
|---|---|---|---|---|
| **Month** | **Price** | **Seller** | **Buyer** | **Volume (KB)** |
| April | 113.57 | Trafigura | Mercuria | 100 |
| April | 113.60 | Trafigura | Shell | 100 |
| April | 113.63 | Trafigura | Shell | 100 |
| April | 113.66 | Trafigura | Shell | 100 |
| April | 113.72 | Trafigura | Shell | 100 |
| May | 113.43 | Shell | Morgan Stanley | 100 |

124.    Shell was the buyer in four out of five April Cash BFOE trades.  In each case the seller was Trafigura. The prices were "walked" higher over the period of the MOC, thereby increasing the contango to the prompt CFD pricing period of February 1 through February 25, 2011 where it was known Shell had major pricing positions.  As shown above, Shell set the Platts April Cash BFOE price at $113.72.

125.    On February 24, 2011, the following single trade took place for CFDs in the Platts MOC:

| CFD Trades | | | | | |
|---|---|---|---|---|---|
| **Dates** | **Basis** | **Diff.** | **Seller** | **Buyer** | **Volume (KB)** |
| 07-11 March | Brent (April) | -0.20 | Shell | Phibro | 100 |

126.    From this single trade, the CFD adjustment to April Cash BFOE to determine the North Sea Dated Strip was calculated. Platts calculated the March 7 through March 11, 2011 CFD as April Cash BFOE minus $0.25 and the March 14 through March 18, 2011 CFD as April Cash BFOE minus $0.31.

127.    Thus Shell set the CFD level adjustment to April Cash BFOE to determine the February 24, 2011 Platts quote for North Sea Dated Strip as follows:

| CFDs | |
|---|---|
| **Date** | **Price** |
| 07-March | 113.47 |
| 08-March | 113.47 |
| 09-March | 113.47 |
| 10-March | 113.47 |
| 11-March | 113.47 |
| 14-March | 113.41 |
| 15-March | 113.41 |
| 16-March | 113.41 |
| **Mean** | **113.45** |

128.    Shell had thus set both Platts MOC components to determine North Sea Dated Strip price of $113.45.

129.    On February 24, 2011 the following trades took place for Dated Brent Cargoes in the Platts MOC:

| Dated Brent Cargo Trades | | | | | | |
|---|---|---|---|---|---|---|
| **Laycan** | **Grade** | **Basis** | **Diff.** | **Seller** | **Buyer** | **Volume (KB)** |
| 15-17 March | Forties | Dated | 0.00 | Shell | Glencore | 600 |
| 13-15 March | Forties | Dated | 0.00 | Shell | ConPhill | 600 |

130.    Thus, Shell set the Forties differential to North Sea Dated Strip which Platts determined from the two Shell trades immediately above was at a discount of $0.11 once "normalized" for contango to the middle of the assessment period.

131.    In summary, Platts assessed Dated Brent on February 24, 2011 at $113.33 because: (1) April Cash BFOE $113.72 set by trades by Shell; (2) CFD adjustment to April cash BFOE $0.27 set by trades by Shell; and (3) Forties discount $0.11 set by trades by Shell.

132.    In addition, as discussed herein, a trade on February 24, 2011 occurred outside of the MOC process and showed the artificiality of Shell's reporting. On this date, Shell was the exclusive setter of prices for the Brent complex in the Platts MOC process and again demonstrated the monopoly power that is both enjoyed and abused by Shell when setting Brent prices in the Platts MOC.

133.    As discussed, Shell had previously established a large short CFD position.  This short CFD position was pricing long from February 21 through February 25, 2011.  Shell had already taken steps to maintain low Forties values in order to advantage this short position.  An example has been given of a trade between Shell and Morgan Stanley on February 21, 2011, which was expressly designed to occur in the Platts MOC and to depress Forties prices.

134.    Yet on February 24, 2011, a crude trader at PetroCanada confirmed the company had offered Forties parcel F0317—loading March 19-21 and therefore outside the 21-day nomination process—at North Sea Dated Strip plus $1 per barrel and that an unknown buyer purchased the cargo near that level.  A crude trader said that the cargo was not purchased by "one of the BFOE boys."  By BFOE boys, this trader was likely referring to the cabal of Defendants, including Shell, which controlled the MOC process.

135.    As previously noted, the Platts MOC assessment period for February 24, 2011 was March 6 through March 17, 2011.  Despite the fact that the PetroCanada cargo sale fell only two days outside of this assessment period, Platts accepted the manipulative activity of Shell inside of the MOC process and set a price for Forties relative to North Sea Dated Strip, which was at least $1.00 lower than the non MOC process trade, which was concluded and confirmed by PetroCanada.  This again demonstrates how Shell manipulatively employed its monopoly pricing power, which was not scrutinized by Platts.

136.    Despite the real world sale at $1.00 over North Sea Dated Strip, in the MOC process Shell sold two Forties Dated Brent cargoes – one to Glencore, the other to ConocoPhillips – at a level even to the North Sea Dated Strip.  Platts determined that Dated Brent should be priced even lower, at a negative $0.11 spread to the North Sea Dated Strip

(perhaps because it incorporated a contango in the market for its calculations), based on an estimate that Forties were valued at negative $0.11.

137.    Shell then purchased four April Cash BFOE cargoes from Trafigura at prices ranging from $113.60 to $113.72 (which is how the North Sea Dated Strip was priced, *i.e.* $113.45 equals the difference between $113.70 and $0.25), and also sold a May Cash BFOE cargo to Morgan Stanley at $113.43.

138.    With Morgan Stanley's assistance, Shell was able to pressure nearby CFD and Dated Brent prices to advantage its nearby CFD book.   Shell behaved uneconomically throughout the latter half of February 2011 in order to suppress prices.  The overarching market fundamentals at this time had in fact turned bullish because there were concerns at the end of February that Libyan production would be disrupted because of unrest in that country.  These shortage concerns should have moved the nearby CFD and Dated Brent markets upward barring some change in the supply and demand fundamentals in the Brent Crude Oil markets, which were not present here.  Nevertheless, Shell was able to force nearby prices downward through manipulation of the MOC process.

139.    But as discussed above, the artificiality of Shell's trades, particularly its CFD and Dated Brent trades, can be shown by a reported trade that occurred just outside the MOC Brent window.  As recounted by a PetroCanada trader, a trade occurred in the loading window of March 19 through March 21, 2011, just beyond the Dated Brent window of March 7 through 16. The PetroCanada trader reported that this trade was priced at a remarkable $1 per barrel above Dated Brent.  Other traders reported that this cargo would actually be loaded out (*i.e.*, consumed) by the buyer, not cancelled out in part of a daisy chain of trades with various counterparties.

140.    Because this trade occurred outside the Dated Brent window, it was not incorporated into the Brent Crude Oil pricing system that Platts employs.  Nevertheless, this trade was a closer reflection of the market reality than that which was artificiality created by Shell's pressure on the market CFD, where it offered $0.25 below Brent April (which Platts estimated at $113.72, Shell's last purchase price).

141.    In summary, Shell was able to artificially suppress the CFD and Dated Brent markets through manipulations of the MOC.  It did this to advantage its short CFD position and likely other derivatives positions, including futures positions.  The economic reality of the market's price was reflected by a real trade outside the Dated Brent window.  However, this real trade, which was substantially and materially higher than the levels reflected by the bogus trades reported by Platts, was never incorporated by Platts' rigid pricing methodology.  In this way, Shell and Morgan Stanley were able to game the Platts system and advantage themselves by creating artificial prices.

### F.    The September 2012 Manipulation

142.    In September 2012, Defendants Shell, BP, Vitol, Phibro and Trafigura manipulated the Dated Brent Crude market and thereby harmed futures traders, including Plaintiffs.  In the first part of the month, BP dominated the suppression of the Dated Brent market.  In the latter half, Shell, Vitol, Phibro, and Trafigura suppressed the market through a combination of spoofing, wash trades and other artificial transactions in the MOC process.  In the middle of the month, defendants manipulated Dated Brent upwards.  Also during the month, the spread between Brent and Forties was manipulated.  In part, these Defendants' suppression of Dated Brent at the end of the month was designed to allow for Brent Crude oil to trade to Asia.

143.    On 19 of the 20 publication days in September 2012 Forties was the least expensive grade of the BFOE complex and thereby set the price of Dated Brent.  On 1 of the 20

publication days in September 2012, Forties was jointly the least expensive grade with the Brent

Ninian Blend (referred to also as BNB or Brent and further being the 'B' in BFOE) and thereby

set the price of Dated Brent.

144.   In September 2012 there were 20 Publication Days for Dated Brent.  On only

eight of these publication days did Platts report cargo transactions in the Dated Brent MOC

process.

145.   Participation for cargo transactions was as follows:

| | Buy | Sell | Net |
|---|---|---|---|
| Shell | 2 | 2 | 0 |
| BP | 0 | 6 | -6 |
| Total | 2 | 0 | 2 |
| Trafigura | 3 | 0 | 3 |
| Litasco | 1 | 0 | 1 |
| Phibro | 1 | 0 | 1 |
| Vitol | 0 | 1 | -1 |
| | **9** | **9** | **0** |

146.   Of the 8 days when cargo transactions were reported, Shell or BP was the seller of

record on 7 days. On 2 of those days BP was a seller to Shell.

147.   During the 20 Platts publication days, there were a total of 33 unfulfilled offers

and 10 unfulfilled bids. Participation in these bids and offers was as follows:

| | Bids | Offers | % Bids | % Offers |
|---|---|---|---|---|
| Shell | 0 | 6 | 0.00 | 0.18 |
| BP | 0 | 21 | 0.00 | 0.64 |
| Total | 7 | 0 | 0.70 | 0.00 |
| Trafigura | 1 | 0 | 0.10 | 0.00 |
| Litasco | 0 | 0 | 0.00 | 0.00 |
| Vitol | 1 | 2 | 0.10 | 0.06 |
| Phillips66 | 0 | 3 | 0.00 | 0.09 |
| Phibro | 0 | 1 | 0.00 | 0.03 |
| Mercuria | 1 | 0 | 0.10 | 0.00 |
| | **10** | **33** | **1.0** | **1.0** |

148.     Collectively BP and Shell made 0 unfulfilled bids and 27 unfulfilled offers in the 20 Platts publication days.  That is, BP and Shell made none of the bids and 82% of offers.

149.     The relative illiquidity of the MOC process is evidenced generally by the fact that single cargoes may enter daisy chains of more than 30 passes, each pass representing a transaction related uniquely to a single set of cargo dates. Trades outside of the Platts MOC process are a very high multiple of trades inside the MOC process and are significantly leveraged by the practice of speculating on Dated Brent prices as evidenced by how cargo nominations are affected by daisy chains.  Daisy chaining creates the possibility that one cargo could change hands many times.

150.     More specifically in this instance illiquidity in the MOC relative to the non-MOC market is illustrated by the fact that during the MOC throughout September 2012, Shell had bought and sold net zero barrels in concluded cargo transactions and had made 6 further offers for Forties cargoes which remained unfulfilled. However, by the end of September 2012, Shell had obtained a massively dominant long position in the Forties grade by September 27, 2012.

**1. Early Month Suppression**

151.     Part of the Dated Brent manipulation commenced at the beginning of September 2012 with the involvement of BP.  In addition to several trades, from September 3 to 13, 2012, BP made 21 unfulfilled offers for BFOE cargoes. Subsequently, BP executed a single MOC cargo trade with Phibro on September 17, 2012. Combined with the concluded transactions, BP deliberately pressured the market downward. BP had set a huge short position in OTC Brent CFDs.

152.     Starting on September 3, 2012, BP offered 3.6 million barrels of North Sea crude oil cargoes, which, according to Platts, "was the largest amount of North Sea crude offered by a

single company in the MOC process in recent years." This amount of oil was equivalent to six cargoes – three Ekofisk, two Forties, and one Brent.

153.    Indeed, market participants had speculated that the reason for such large offers was that BP had a significant number of unsold cargoes. However, BP's conduct was not economically rational for a company that had a large number of unsold cargoes. The reason why companies would not offer that amount of crude into the MOC process is because physical trading is relatively illiquid during the MOC process compared to the full trading day. Fewer market players participate in the MOC process. Thus, BP's offering 3.6 million barrels of oil in a short time frame, and in an illiquid and relatively thinly traded market would be counterproductive. A company that held those cargoes would normally not want to impact price negatively and would therefore have offered the cargoes more gradually in the open market over the course of the day, not all at once during the short, thirty-minute MOC process.

154.    In fact, it was BP's design to drive the Dated Brent market lower with its offers of six cargoes in the MOC process. This is because BP was short at least 5 million barrels of nearby CFDs. These positions stood to benefit from the depression in the Dated Brent price. As a consequence, BP was incentivized illicitly to depress the price of Dated Brent. The size of BP's short position in CFDs was such that it was more than able to offset any losses that BP would experience in reduced sales price for its physical cargoes.

155.    BP continued its conduct to pressure the market on September 4, 2012, offering a "raft" of North Sea cargoes in an attempt to give the impression that there was a glut of oil in the nearby market.

156.    On September 5, 2012, BP pushed the front of the CFD curve down further by offering six more BFOE cargoes, two of which were Forties, two Ekofisk, one Brent and one

Oseberg.  It sold one cargo to Defendant Trafigura.  This sale cemented the lower prices into the Platts MOC pricing methodology, ensuring that Platts would report prices at these low numbers. In the context of this conduct, a trader in the market remarked that "BP is on its own planet." Another trader commented that "A lot of the big Dated Brent players seem to think the structure should be lower and are shorting it. . . ."  Platts assessed Forties (and therefore Dated Brent) at minus $0.42 the North Sea Dated Strip.

157.    On September 6, 2012, Platts assessed Forties (and therefore Dated Brent) at minus $0.36 the North Sea Dated Strip.  No trades were executed for Forties.  Platts assessed Dated Brent at nearly the same price as on September 5 – minus $0.36 North Sea Dated Strip. Also on September 6, 2012, BP engaged in a sham trade with Shell intended to bring the Brent stream in line with Forties.  This trade was priced for a Brent (not Forties) cargo loading on September 20-22 at Dated Brent minus $0.25 per barrel.  This price was simply out of whack with market prices.  However, because it had such a nearby time frame for loading it was difficult for buyers to find freight on short notice.  There were traders willing to buy cargoes at significantly higher prices, even in the MOC process, at slightly later dates when freight was more readily available.  Total Oil, for instance, bid for a cargo loading at the back end of the curve at a price that was significantly higher than BP's trade with Shell.  But the BP/Shell trade impacted Platts' Dated Brent pricing.  This sale convinced Platts to mark Brent between minus $0.25 and the Total bid.  Platts priced Brent at minus $0.125 per barrel.  This price was artificial and based on a collusive and sham trade between BP and Shell.

158.    Immediately following the sale of Brent from BP to Shell on September 6, 2012, BP and Shell constructed a trade in the MOC on September 7, 2012 which raised Forties to

parity with Brent for the first time in almost 2 years.  On the same day, Brent was assessed at parity with Forties for the first time since January 2011.

159.    Although these trades were irregular, Platts was reluctant to exclude the trades because BP and Shell are significant sources of revenue to Platts, as is the assessment of the BFOE complex itself.   Were Platts to determine that either Shell or BP were engaged in manipulative activity: a) Platts would have to exclude BP and Shell from the BFOE assessment process (MOC) for some considerable period of time which would, given the dominance of BP and Shell in the MOC, render their quotations for that period hollow, and b) then BP and Shell may react to a Platts ban by withdrawing from the MOC and the very existence of the Platts Crude Oil Marketwire, Platts' flagship and highly lucrative publication, would itself be called into question.  BP and Shell held significant influence and power over Platts, and thus the entire market because, through their manipulative conduct, there are able to cause artificial price trends. Platts had enormous financial incentives and pressure to ignore the implication of Defendants' manipulative trades.

160.    However, the trades were uneconomic.   The anomalous relationship between Brent and Forties prices demonstrates this.   The data for September 2012 of Platts outright quotations for Brent (BNB) minus Forties is presented as follows:

| MOC Date | Brent Minus Forties |
|---|---|
| 9/3/2012 | 0.540 |
| 9/4/2012 | 0.560 |
| 9/5/2012 | 0.520 |
| 9/6/2012 | 0.235 |
| 9/7/2012 | 0.000 |
| 9/10/2012 | 0.125 |
| 9/11/2012 | 0.125 |
| 9/12/2012 | 0.105 |
| 9/13/2012 | 0.070 |
| 9/14/2012 | 0.030 |
| 9/17/2012 | 0.035 |

| 9/18/2012 | 0.240 |
|-----------|-------|
| 9/19/2012 | 0.265 |
| 9/20/2012 | 0.190 |
| 9/21/2012 | 0.100 |
| 9/24/2012 | 0.325 |
| 9/25/2012 | 0.335 |
| 9/26/2012 | 0.345 |
| 9/27/2012 | 0.335 |
| 9/28/2012 | 0.610 |



161.    BP and Shell had a motivation to maintain Brent at an artificial parity with Forties

starting September 7, 2012 – at a time when they had significant physical and derivative Brent

Crude Oil positions.  Consequently, they created a very infrequent (once in two year) pricing

situation.  The motivation to maintain the Brent/Forties at parity or near to parity appears to have

ended on or around the September 17 or 18, 2013.  At this point, the market was further

manipulated by BPs sale to Phibro, which is discussed below.

## 2. Mid-month Inflation

162.    As part of its manipulation of the Brent/Forties relationship, and as part of an overall plan to inflate Dated Brent in the middle of this month, on September 7, 2012, BP and Shell engaged in a trade for a Forties cargo during the MOC for plus $0.20 over North Sea Dated Strip − that is, $0.56 higher than the previous day's Dated Brent assessment.  This price was a high offer and therefore at a level that was unattractive to other market participants.  BP sold Shell a Forties parcel loading September 27, 2012 at this level just prior to the end of the MOC. BP and Shell's manipulation moved the Platts Dated Brent to minus $0.05 the North Sea Dated Strip, even though it had been assessed at minus $0.36 North Sea Dated Strip the day before. Traders noted that the trade between BP and Shell at plus $0.20 was not in line with the market, and therefore Platts was forced in its assessment to discount to a degree the BP and Shell trade because it was so out of line with other bids in the market, particularly one by Total Oil, Europe's third-largetst oil company, at the latter part of the 10 to 21 day window.  The BP/Shell trade nonetheless significantly artificially affected the price and price trends of Dated Brent.

163.    On September 10, 2012, Shell confirmed that it had deferred a Forties cargo that it was supposed to load in September to an October loading period.  This move belied the pricing structure provided by Platts (based on manipulative conduct of Shell and BP), which showed a backwardation − *i.e.*, that prices nearby were more expensive than the deferred.   In a backwarded market, it would not have been in a trader's economic interest to postpone a cargo, because the nearby oil was more valuable.  And between September 11 and 17, 2012, several more cargoes were deferred from a nearby loading position to October.  Some of these deferrals were described as "forced", but reports of their existence, and Shell's control of them, confounded the market and left it susceptible to manipulation.

164.    During this middle period of September 2012, Shell manipulated the market upward in various ways.  In order to counteract the lowering of prices, Shell and Statoil fixed two VLCCs which, purportedly, were going to transport Brent Crude Oil to the Far East, and Korea in particular in early- to mid-October.  These VLCC created upward pressure on nearby prices because the market assumed that the cargoes would reduce supply in the nearby Brent Crude Oil market.  However, the booking of these cargoes really was for the purpose of adding upward pressure on market prices.  In fact, traders suggested that the "arbitrage" trade of North Sea Brent Crude Oil to Korea was not feasible given the pricing structure of oil and freight.  The booking of the VLCCs was used as a manipulative maneuver by Shell and created great confusion in the market, especially because Shell and Statoil refused to clarify their intentions.  This situation is one of many in which other market players are expected to believe that major traders are trading in the MOC in pursuit of clarity and discovery of price, without any factual support or indication of what is truly happening to the large, market-moving volumes of oil involved.

165.    Shell and Statoil's conduct impacted prices and trends for Dated Brent and for Brent futures contracts.  On September 13, 2012, the Brent October futures contract expired at a $1.01 per barrel premium to November.  This backwardation was at levels much higher than earlier in the month and was the consequence of the booking of the VLCCs by both Shell and Statoil.  That is, the reported bookings of these large tankers squeezed the nearby futures since the market interpreted the loading out of large amounts of Brent Crude from the North Sea in October to be a bullish pricing factor.

166.    Because of the perceived tightness in the market from the reported VLCC bookings, Dated Brent prices increased on September 13, 2012.  BP offered Forties at plus $0.17

44

over North Sea Dated Strip but withdrew the offer in the MOC.  Given this offer and other intangible factors, such as the VLCC cargoes and the effects on the futures markets, Platts raised Forties by $0.135.

167.    On September 14, 2012, the market continued to climb based on these same intangible reports.

168.    On September 17, 2012, Shell and Statoil's reported VLCC bookings continued to cause inflation to the market.  Forties increased to plus $0.065 over the North Sea Dated Strip.  Contemporaneously, Defendant Phibro created upward pressure in the Forties when it purchased a Forties cargo for October 3 to October 5, 2012 for $0.05 plus North Sea Dated Strip.

**3.  Late Month Suppression**

169.    BP's sale of the cargo to Phibro on September 17, 2012, initiated a manipulation of the Dated Brent downward.  Defendants' collusive market manipulation continued to create artificial price trends for Dated Brent.

170.    The following day, September 18, 2012, Phibro, with the help of other market participants, drove the market downward by offering in the MOC the very same cargo that it bought the day before at minus $0.25 below North Sea Dated Strip, a full $0.30 below its purported purchase price 24-hours earlier.  At this price, there were no bids from others in the MOC process.  In response, Platts assessed Forties to minus $0.245 under the North Sea Dated Strip.  Phibro was not acting rationally by offering the cargo it had just bought.  Rather, Phibro deliberately was signaling to market participants that the market was heading lower.

171.    By the following week the Brent market was in a complete state of disruption, due, in substantial part, to Shell's manipulative conduct.  On September 24, 2012, Shell led a sell-off, in a market devoid of transparency.  As one trader described it, "It's hard to get an opinion on the

fundamentals . . . ."   Another trader described the market as full of "a lot of lies."   In this informational vacuum, Shell made sure that there were no buyers in the market.   The one bid in the MOC process on September 24, 2012 had been from Total Oil for an October 13 to October 17, 2012 loading period.   Shell sold Total Oil the cargo and removed the only supporting price from the MOC.   After Shell sold this cargo to Total Oil, there were no bidders to take the three Forties and two Ekofisk cargo offered in the market, many of which were offered by Shell.   Shell, offering the Forties cargoes, pushed Dated Brent down substantially.   Dated Brent, which priced off the Forties, fell an astounding $0.375 on that day to minus $0.325 under North Sea Dated Strip.   This was the largest one-day fall in the Forties crude prices since June 12, 2012.   Because of this move, Dated Brent fell to a $0.43 contango to second month [November] Cash BFOE, the widest since mid-July.

172.   On September 25, 2012, Shell continued to use manipulation to depress the Dated Brent market.   On this day it engaged in a wash trade with Trafigura.   Shell offered a Forties cargo (designated "F1005") for loading October 10 to October 12 at North Sea Dated Strip minus $0.30.   Trafigura reportedly purchased this parcel.   As a result of this trade, Platts assessed Dated Brent at North Sea Dated Strip minus $0.285.   The trade between Trafigura and Shell was a wash trade intended solely to influence the MOC process and prices of Dated Brent.   The trade served no other economically justifiable or rational purpose.

173.   On the following day, September 26, 2012, Shell mistakenly offered the F1005 cargo for loading at October 10 to October 12.   It quickly withdrew this offer. The offer surprised the majority of North Sea crude traders, as Shell had just sold that same cargo to Trafigura the previous day.   Shell also kept a cargo that it held from another trader for loading October 21 to October 23.

174.    By September 26, 2012, Shell held least 10 of the 16 Forties cargoes loading October and five of the seven Brent cargoes, making it the major stakeholder in October's BFOE market.   In other words, at the end of September 2012, Shell had market power and a monopolistic position in the Brent market.   Shell used its market power to depress prices.   The reason Shell intended to depress prices, and the reason it had acquired a dominant position in the BFOE market, was to advantage its other trading positions in derivatives – *e.g.*, CFDs and futures.

175.    On September 26, 2012, the Brent futures markets displayed strength in the nearby futures to the point of backwardation.   For this reason, the Forties differential was assessed at North Sea Date Strip minus $0.24, up 4.5 cents on that day, in line with the futures backwardation and a steeper CFD market.   The Forties market did not necessarily manifest the same strength because of Shell's and other defendants' conduct.   Indeed, the weakness in the Forties was considered illusory to some traders, who joked, "Forties traded lower so the Brent [futures] spread rallied."   In fact, Shell had manipulated the Forties market (and BFOE market generally) in order to advantage itself in its related derivatives positions, including in the CFD and futures markets as well as in its arbitrage positions with Dubai Crude, discussed below.

176.    By September 27, 2012, Shell had at least 12 of the 17 Forties cargoes loading in October.   There were no bids or offers in the MOC assessment process.   Platts therefore assessed Dated Brent in line with the Brent futures structure.   Platts noted that there was significant strength in the November Brent market relative to its weakness in October.   Thus, as Shell's position became known, Forties stabilized, and notably the physical arbitrage of Dated Brent relative to Dubai Crude was closing (as alleged more fully below).

177.    On Friday, September 28, 2012, despite the strength in the November Brent physical market, certain BFOE players continued their efforts to depress the October Brent market.  Shell spoofed the market by reoffering its same Forties cargo (F1005) for loading October 10 to October 12, then withdrawing it.  In Shell's place as the maker of artificial prices in the MOC process, Vitol sold Trafigura a cargo for loading October 11 to October 13 at North Sea Dated Strip minus $0.55.  This price was a remarkable $0.34 below Platts' Thursday assessment for the same loading period.  Vitol's trade was used as an overhang to the Brent market, even though, aside from these Forties offers, the Brent crude market was much more tightly priced.  Because of this artificial trade Platts assessed Forties almost $0.30 below the previous day's figure, at North Sea Dated Strip minus $0.46.

178.    In sum, on September 28, 2012, Shell attempted to bluff the re-offer of the October 10 to October 12 cargo (the object of the manipulative trade with Trafigura) to find no buyer but Vitol.  Trafigura executed a trade which Plaintiffs believe was manufactured by those participating in the South Korean arbitrage (or those with synthetic arbitrage positions constructed from futures or other derivatives). At this time Shell was lacking in credibility and coincident interests of Vitol manufactured a bogus trade.

179.    Overall, for the month of September 2012, out of 33 offers reported by Platts, 21 came from BP (in the first half of September), 6 came from Shell (mostly in the last half of September) and two from Vitol on September 24, 2012.  These three companies made 88 percent of the offers in the market in this month, which saw an unreasonable and artificial suppression of the Dated Brent benchmark at the beginning and the end of the month.  Likewise, Vitol, Shell and BP sold the vast majority of the cargoes reported as having traded in the MOC process for

September.  And Shell, BP and Vitol were responsible for the vast majority of the sales in the CFD MOC process for the month of September.

180.    The conduct of Shell, BP, Statoil, Trafigura, Phibro and Vitol during this month impacted pricing trends of Dated Brent and the prices of Brent futures in substantial ways, including by affecting the differential between Brent futures and WTI futures.

181.    The activity of BP and Shell and others in the Platts MOC process during September 2012 constitutes uneconomic and manipulative behavior.  The manipulation was designed to and did affect the relative BFOE prices in terms of time spreads (the forward curve) and geographic arbitrage (shipments to Korea, the U.S., etc., and both physical and derivatives arbitrage).  This is evidenced by the large (at least 5 million barrel) short derivatives position BP established, which priced directly against the Platts quotations that were being manipulated.  It is further evidenced by the large physical cargo position accumulated by Shell as it manipulated prices lower.

182.    Defendants manipulated time spreads in several ways.  For example, as discussed above, the manipulative activity caused the October-November ICE Brent spread to rise to 58 cents/barrel by 4:30 p.m. London time Wednesday, September 12, 2012.  This futures movement occurred at the same time that the CFD differentials increased in the MOC process.  Many oil traders expressed surprise at this strength.  One stated: "How on earth can the spread be so high," said one trader. "Someone is very bullish the paper but that doesn't make sense . . . the physical market continues to struggle." "It was all paper-driven," said a second trader, noting that Brent intermonth spreads had lowered at the end of the day from their previous intraday highs.  Adding to this confusion was is the fact that at the same time Forties was experiencing cargo deferrals.

This was particularly confusing because BP, via the Forties Pipeline System, was the scheduler of Forties cargoes, and BP did nothing to clarify the Forties scheduling.

### G.   The Dubai/Brent Manipulation

183.   Defendants also manipulated Dated Brent and price trends in order to affect geographic arbitrage of physical cargoes.   Regarding inter-regional physical arbitrage, Defendants joined together and agreed in September to either promote or discount the movement of BFOE oil out of the North Sea region.   On several occasions traders inquired as to whether Brent Crude Oil was priced to move to the Korean market.   Throughout the beginning of September traders discussed the possibility of this arbitrage, including the fixing of VLCCs by Statoil and Shell to ship Brent Crude Oil to Korea.   The depression of prices in the early part of the month created the opportunity for Shell and Statoil to accumulate cargoes.

184.   Then, on September 13, 2012, the expiry of the October ICE Brent futures contract coincided with two VLCC exports from the North Sea to South Korea planned for October.   As a likely consequence, October futures expired at a $1.01 per barrel premium to November by 4:30 p.m. London time.   Demonstrating the artificiality of the pricing, traders commented that the level of backwardation in October and November was much higher than seen earlier this month even as the physical market had remained weak due to a lack of demand from European refiners amid the maintenance season. "Backwardation is picking up but it's all over the place," said one trader. "It's hard to know whether that's driven by physical market strength or not."   A second trader said: "I can't read the physical at the moment . . . it looks a touch heavy if anything, even with the cargoes going East."   To effect this manipulation, Shell fixed a VLCC, the Pu Tuo San, to leave Scotland between October 10 and 15.   Statoil's VLCC was set to sail from Norway between October 14 and 15.   Notably, trading sources at Shell and

Statoil declined to comment on the cargo movements.  Shell and Statoil's manipulative use of the VLCC had artificially influenced the market.

185.    The activity of Shell, BP and others during the month of September was overall designed to lower the Dated Brent premium relative to Dubai Crude and thereby force open the physical arbitrage.

186.    Dubai Crude is the primary crude oil benchmark against which other grades of crude oil are referenced in the Asian markets. Generally speaking, the Dated Brent benchmark in Northwest Europe ("NWE") trades at a premium to the Dubai benchmark.  Thus, the lower the Brent premium to Dubai is, the more possible is the physical arbitrage movement from NWE to South Korea.

187.    The relationship between Brent and Dubai Crude Oil is shown below, with the Brent manipulation downward at the beginning of September apparent along with the end of the manipulation at the end of the month.  The bogus trades of the September 25 and September 28 described above are particularly obvious here.



| Date | Brent/Dubai |
|---|---|
| 8/17/2012 | 3.20 |
| 8/21/2012 | 3.08 |
| 8/22/2012 | 2.96 |
| 8/23/2012 | 3.12 |
| 8/24/2012 | 3.32 |
| 8/27/2012 | 3.12 |
| 8/28/2012 | 2.94 |
| 8/29/2012 | 2.72 |
| 8/30/2012 | 2.77 |
| 8/31/2012 | 2.97 |
| 9/3/2012 | 2.22 |
| 9/4/2012 | 2.09 |
| 9/5/2012 | 2.11 |
| 9/6/2012 | 1.89 |
| 9/7/2012 | 1.77 |
| 9/10/2012 | 1.67 |
| 9/11/2012 | 1.48 |
| 9/12/2012 | 1.77 |
| 9/13/2012 | 1.54 |
| 9/14/2012 | 2.13 |
| 9/17/2012 | 1.99 |
| 9/18/2012 | 1.91 |
| 9/19/2012 | 2.04 |
| 9/20/2012 | 1.97 |
| 9/21/2012 | 2.21 |
| 9/24/2012 | 2.44 |
| 9/25/2012 | 2.01 |
| 9/26/2012 | 2.03 |
| 9/27/2012 | 2.39 |
| 9/28/2012 | 1.93 |
| 10/1/2012 | 1.70 |
| 10/2/2012 | 1.84 |
| 10/3/2012 | 1.92 |
| 10/4/2012 | 1.87 |
| 10/5/2012 | 2.41 |
| 10/8/2012 | 2.49 |
| 10/9/2012 | 2.81 |
| 10/10/2012 | 2.89 |
| 10/11/2012 | 3.16 |
| 10/12/2012 | 2.86 |
| 10/15/2012 | 3.04 |

188.    On October 1, 2012, the market finally recognized the fundamental situation with Shell as the main owner in the Platts 10-25 day window.  The depressed market rebounded on this day.  "The prompt was clearly looking a bit distressed but I'm not sure you can say that anymore," said a trader after the Platts MOC assessment process.  "There is only one owner really and they clearly don't want to sell at these levels," another trader said of Shell and its physical position in Forties.  Shell held almost every cargo in the last two thirds of October.

### H.    The Urals Benchmark Manipulation

189.    The activity by Shell in the Brent MOC was not its only activity designed to manipulate relative prices for crude oil grades in September 2012.  Shell is also an active participant in the Platts MOC for Russian Crude Oil (known as Urals crude oil).  This Urals MOC is designed to fix relative values for Urals crude oil in both NWE and the Mediterranean.  Shell attempted to manipulate the relative value of Urals crude oil in NWE which is the only other significant Northern European price benchmark.  Urals crude oil is of comparative quality to Forties crude oil.  The two blends are often viewed as substitutes for each other when comparative differentials and refinery margins permit.  Urals crude oil in NWE has influence on inter-regional arbitrage pricing as do BFOE prices.

190.    On September 13, 2012 in the Platts Urals MOC Shell sold to Statoil a cargo (720MB) of Urals crude oil ex Primorsk or Ust Luga October 1 to October 5, 2012 at a differential to Dated Brent of $1.85.  This trade was so out of line with market fundamentals that in this rare instance, Platts was not able to manufacture any purported legitimate reason to accommodate the trade with an exception and was forced to discard this "uncompetitive" trade by Shell from the value calculation for the day.

191.    Thus, while Shell was intending to manipulate Dated Brent, it also was attempting to artificially influence the only other benchmark with similar characteristics to Brent.

I.     **By Manipulating Dated Brent and Brent Crude Oil Prices Defendants Also Manipulated Brent Crude Oil Futures Prices**

192.   Brent Crude Oil futures contract prices are inextricably and mathematically linked to Platts' and other PRAs' pricing assessments of market participants' transactions.  Therefore, reporting inaccurate or misleading Dated Brent and Brent Crude Oil transactional prices also results in artificial prices for the Brent Crude Oil futures contracts and other related derivative contracts.

193.   A commodity futures contract is a standardized agreement to buy or sell a commodity, such as Brent Crude Oil, at a date in the future.  Futures contracts have two sides: The "long" side is the buyer of the contract who is obligated to take delivery and pay for the commodity if the buyer holds the contract until the specified delivery date.  The "short" side is the seller of the contract who is obligated to make delivery of the commodity on the delivery date.

194.   The Brent Crude Oil futures market can be thought of as a clearinghouse for trades among buyers and sellers of Brent Crude Oil futures contracts, which are standardized contracts used to price Brent Crude Oil at various maturities.  The Brent Crude Oil futures market is inextricably linked to the market for Brent Crude Oil and thus to Platts pricing, and price movements in the spot market can and do cause price movements in the futures markets.

195.   Indeed, Brent ICE futures use media reports to derive the price of the futures contract, and Platts is the primary media source for Brent pricing.

196.   Brent Crude Oil futures traders, like Plaintiffs, refer to the prices published by Platts and the other PRAs for price discovery and for assessing price risks in the Brent Crude Oil market.  An increase in the price published by Platts signals either stronger demand or weakened supply, and futures traders take account of both price movements and changes in the

supply/demand balance when conducting their futures trading.  This price impact is expected. Brent Crude Oil futures overlay the conventions and conditions of the Brent Crude Oil spot market.  Generally and including during the Class Period, Brent Crude Oil futures prices derive their valuation from observable transactions.  A bid or offer in the market is the first point in a commercial transaction. Brent Crude Oil spot and futures prices move in the same direction. That is why futures markets are used to hedge price exposure.

197.   This is just another way of expressing the integrated characteristics and thus arbitrage realities of the price of Brent Crude Oil.  Pricing trends in the Brent Crude Oil spot directly affect Brent Crude Oil futures.  The expiration (or conversion) of a Brent Crude Oil futures contract into a physical position also results in the convergence of price especially when the spot price sets the futures expiration price.  The physical delivery mechanism ensures price convergence between the spot and futures market.  When these high correlations or conversions are disrupted by the manipulation of prices (creating false values/prices), *i.e.*, a manipulation of the Platts Brent Crude Oil benchmarks, it has effects that ripple throughout the Brent Crude Oil and futures market.  Examining the differentials between the prices of Brent and WTI futures is one way to detect how manipulation of physical Brent Crude Oil affects futures prices.

198.   Because it is the most important price marker for Brent Crude Oil in the world, Dated Brent, and thus the integrity of the Platts MOC, is paramount.  As such, manipulation of Platts' price assessments of Brent Crude Oil artificially affects the price of Brent Crude Oil futures contracts.

199.   Not all futures contracts traded each year result in delivery of the underlying commodities.  Instead, traders generally can offset their futures positions before their contracts mature.  For example, a purchaser of a futures contract can cancel or offset his or her future

obligation to the contract market/exchange clearinghouse to take delivery of crude oil by selling an offsetting futures contract.  The difference between the initial purchase or sale price and the price of the offsetting transactions represents the realized profit or loss.

200.    Futures markets like NYMEX and ICE are specifically designed to facilitate and ease trading in one central marketplace for traders who are located throughout the United States and the world.

### 1.    NYMEX

201.    NYMEX is a designated contract market under Section 5(b) of the CEA, 7 U.S.C. § 7(b).  NYMEX is the world's largest physical commodity futures exchange and the preeminent forum for energy.  There are a number of futures contracts based on the Brent Crude Oil benchmark that can be purchased or sold on NYMEX.

202.    These contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms.  Globex is an electronic trading platform owned by the CME Group, the parent company of NYMEX.

203.    In addition to trading on electronic platforms, many futures contracts such as the Brent Crude Oil Last Day Futures (BZ) and the Brent Financial Futures (CY) trade through open outcry at the NYMEX in New York.  Open outcry is a method of public auction for making bids and offers in the trading pits of the futures exchange.

204.    NYMEX futures contracts priced, settled or benchmarked to Brent Crude Oil include:

a.    Brent Crude Oil Last Day Financial Futures (BZ) – Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The

Floating Price is equal to the ICE Brent Crude Oil Index price as published one day after the final trading day for the delivery month.

b.      Brent Financial Futures (CY) - Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price for each contract month is equal to the arithmetic average of the ICE Brent Crude Oil Futures first nearby contract settlement prices for each business day that it is determined during the contract month.

c.      Brent Crude Oil Penultimate Financial Futures (BB) – Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price is equal to the ICE Brent Crude Oil Futures' first nearby contract settlement price on the penultimate trading day for the delivery month.

d.      Brent Crude Oil vs. Dubai Crude Oil (Platts) Futures (DB) – Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price for each contract month is the arithmetic average of the ICE Brent Crude Oil Futures first nearby contract settlement price minus the mid-point between the high and low quotations from Platts Crude Oil Marketwire for the Dubai front month price for each business day during the contract month.

e.      WTI-Brent Financial Futures (BK) - Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price for each contract month is the arithmetic average of the Light Sweet Crude Oil first nearby contract settlement price for each business day that it is determined minus the ICE Brent Crude Oil Futures first nearby contract settlement price for each business day that it is determined during the contract month.

57

205.    These contracts trade in 1,000 barrel increments with prices quoted in U.S. dollars and cents per barrel.

206.    Defendants purposefully manipulated prices of Brent Crude Oil and Brent Crude Oil futures contracts on NYMEX through their deliberate and systematic submission of false Brent Crude Oil trade information to Platts.

207.    Defendants knew that false trade information was used by Platts to calculate and publish its Brent Crude Oil prices.

208.    Defendants also knew, as sophisticated market participants, that the (mis)information they provided directly impacted the prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the United States and elsewhere. Through the conduct alleged herein, Defendants intentionally and recklessly caused prices of Brent Crude Oil and Brent Crude Oil futures contracts to trade at artificial levels.

### 2.    ICE

209.    ICE is the second largest regulated energy futures exchange in the world.

210.    In June 2001, ICE acquired International Petroleum Exchange of London Limited ("IPE"), one of the world's largest energy futures and options exchanges.  The IPE's flagship commodity, Brent Crude Oil, was a world benchmark for oil prices.

211.    Brent Crude Oil futures contracts were traded via open outcry on the floor of the IPE until April 7, 2005, when its name was changed to ICE Futures and all trading in Brent Crude Oil futures on ICE was shifted onto an electronic trading platform.  ICE Futures is the world's largest host of crude and refined oil futures trading.  The ICE Brent Crude Oil Futures contract is relied upon to price two-thirds of the world's physical crude oil.

212.    As on the NYMEX, ICE Brent Crude Oil futures contracts trade in 1,000 barrel increments.

213.    ICE is regulated by the U.K. Financial Conduct Authority, with additional oversight by the U.S. Commodity Futures Trading Commission for linked contracts.

214.    The ICE Brent futures contract is traded at ICE Futures Europe and executed on the WebICE trading platform, which is distributed in more than 70 countries, including the U.S. In 1999, ICE obtained the CFTC's permission to install computer terminals in the United States to permit traders in New York and other U.S. cities to trade European energy commodities through the ICE Exchange.  In January 2006, the CFTC further permitted ICE to use its trading terminals in the United States for the trading of U.S. crude oil futures on the ICE Futures exchange.

215.    The ICE Brent futures contract is a deliverable contract based on "exchange for physical" or "EFP" delivery with an option to cash settle, using the ICE Brent Index price for the day following the last trading day of the futures contract.  Prices of ICE Brent Crude Oil Futures contracts are quoted in U.S. dollars and cents per barrel.  Trading in ICE Brent Crude Oil Futures contract terminates at the end of the designated settlement period on the Business Day immediately preceding: (i) either the 15th day before the first day of the contract month, if such 15th day is a Business Day; or (ii) if such 15th day is not a Business Day, the next preceding Business Day.

216.    The ICE Brent Crude Oil futures contract was developed in 1988 when the Brent crude oil physical market was trading on a 15-day basis.  The expiry calendar established at that point, which continues today for existing ICE Brent Crude Oil futures, reflected the 15-day timetable.  Existing ICE Brent Crude Oil futures therefore currently expire 10 days after BFOE

contracts have started to go "wet," *i.e.*, to turn into specific Dated Brent contracts with respect to the contract delivery month in question.

217.   According to ICE, the "ICE Brent futures contract is based on the underlying physical BFOE market," and the "ICE Brent futures contract is linked to forward BFOE contracts and hence the underlying Dated Brent market by the [EFP] mechanism. The contract settles against the ICE Brent Index price for the day following the last trading day of the Brent futures contract. At expiry of a Brent futures contract, the index price is based on the average value of BFOE cash cargoes on expiry day. The Index is also calculated by the exchange every day."

218.   Further, ICE's corporate website states that "[t]he cash settlement price for ICE Brent . . . is based on the ICE Brent Index at their respective expiries. The index represents the average price of trading in the 25-day "cash" BFOE market in the relevant delivery month as reported and confirmed by the industry media [e.g., Platts]. . . . The index is calculated by the Exchange as an average of the following elements:

     a.     A weighted average of first month cargo trades in the 25-day BFOE market;

     b.     A weighted average of second month cargo trades in the 25-day BFOE market plus a straight average of the spread trades between the first and second months; and

     c.     A straight average of designated assessments published in media reports [*e.g*., Platts]."

219.    In response to Platts extending its assessment period to a 10 to 25 day period, ICE launched the ICE Brent NX Brent futures contract, which has an expiry calendar based on the 25-Day BFOE market, which aligns the futures expiry calendar with the physical BFOE market.

### 3.    Defendants Manipulated Brent Crude Oil Futures Prices

220.    Defendants purposefully manipulated prices of Brent Crude Oil and Brent Crude Oil futures contracts through their deliberate and systematic submission of false Brent Crude Oil trade information to Platts.

221.    Defendants knew that this false trade information was used by Platts in calculating and publishing its Brent Crude Oil prices.

222.    Defendants traded substantial volumes of Brent Crude Oil futures.  Defendants knew, as sophisticated market participants, that the (mis)information they provided directly impacted the prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the United States and elsewhere. Through the conduct alleged herein, Defendants intentionally and recklessly caused prices of Brent Crude Oil and Brent Crude Oil futures contracts to trade at artificial levels.  This manipulation had the effect of benefitting Defendants' positions in the Brent Crude Oil futures.

223.    As major oil market participants, Defendants have the motive and financial incentive to manipulate Brent Crude Oil prices through contrived reports to Platts and other PRAs. Such manipulation: (a) enhances the value of Defendants' financial or derivative or physical positions, and (b) improves the price of purchase or sale obligations.  Each Defendant's production, sales, trading and other participation in the financial, derivative or physical crude oil market are connected with or based on prices of Brent Crude oil.

224.     Defendants' BP, Shell, and Statoil's key positions in the sales points for three of the four physical markets allows them individually and even more so collectively to enjoy privileged positions along the supply chain which gives them access to critical and valuable nonpublic information.  They are better informed about current and future supply and demand balances and flows that are not available to the markets at large.  Defendants can exploit this asymmetry of information to the disadvantage of other market participants, including traders in futures contracts.

225.     As holders of this advantageous non-public information, Defendants are well positioned to influence the market.  Market participants will follow Defendants' lead from their conduct in the market.  Defendants have used this power, coupled with their ability to influence the MOC process, to manipulate Dated Brent and Brent futures contracts.

226.     Each Defendant trades substantial volumes that are provided to Platts.  This includes reports of significant physical, financial or derivative transactions, including transactions with one another and other firms they know.  Defendants and other market participants are under no legal or regulatory obligation to provide their deals to Platts, but the industry heavily relies upon Platts and other PRAs to interpret and publish prices.  IOSCO conducted a study and concluded in October 2012 that price assessments could be vulnerable to manipulation because traders participate voluntarily, meaning they may selectively submit only trades that benefit their positions, in violation of the Platts rules.

227.     During the Class Period, Brent Crude oil prices indicate repeated distortions that are consistent with contrived reporting to move prices.

228.     For example, in addition to the distortions set forth above, during the five-year time period between approximately June 2008 and June 2013, the average change in the ICE

Brent Index price on ICE Brent Crude oil futures settlement days (i.e., the trading day following the last day of trading, or "expiration day," of the ICE Brent Crude oil futures contract) was substantially greater than the average change in the ICE Brent Index price on non-settlement days.

229.   Additionally, during the two year period from July 1, 2008 through June 30, 2010, the average change in the ICE Brent Index price on ICE Brent Crude Oil futures settlement days was substantially greater than the average change in the ICE Brent Index price on non-settlement days.

230.   Moreover, there have been recurring instances of substantial price movements on Brent settlement dates including movements in the price for Dated Brent.

231.   The news flow and fundamentals of supply and demand for Brent Crude oil pricing did not remotely support or justify the foregoing repeated distortions. Contrived reporting by market participants in their submissions to the price reporting services caused the distortions.

### 4.     Regulatory and Enforcement Actions Involving Defendants

232.   Defendants Shell, BP and Statoil have recently publicly stated that they have been raided by the EC in order to obtain documents relating to an investigation of, among other things, contrived reporting of crude oil prices to Platts.

233.   On May 17, 2013, the Chairman of the U.S. Senate's Energy Committee requested that the Department of Justice join the investigation into potential crude oil market manipulation, including the impact on the U.S. market.

234.   In addition, on June 24, 2013, the U.S. Federal Trade Commission ("FTC") opened a formal investigation into how prices of crude oil and petroleum-derived products are set. The FTC investigation reportedly mirrors the European Commission inquiry.

235.    The EC has stated publicly that it has

concerns that the companies may have colluded in reporting distorted prices to a Price Reporting Agency to manipulate the published prices for a number of oil and biofuel products. Furthermore, the Commission has concerns that the companies may have prevented others from participating in the price assessment process, with a view to distorting published prices.[1]

236.    Collusively contrived reporting to Platts increases the odds that the false reports will be published because if two participants report the same number to Platts or otherwise support or confirm such number to Platts, it is more likely to be published.

237.    Each Defendant simultaneously engaged in the parallel, highly unusual and unlawful act of restraining trade by submitting contrived reports to Platts and other PRAs in order to move these benchmark prices and, therefore, the Brent Crude Oil futures contract and options prices. As a direct and foreseeable result, all such prices were repeatedly distorted and artificial.

238.    A recent article in the *Wall Street Journal* reports statements by various persons who declare or imply that contrived reports are in fact routinely submitted to various price reporting services in order to move energy prices related to Brent Crude Oil:

a.    A London-based oil trader asserted that he and others regularly try to profit by placing bets that a benchmark will fall, using futures contracts or swaps, then trying to drive prices down by selling cargoes at below-market prices and reporting the deals to Platts.

b.    In some fuel markets, according to traders, so few daily transactions occur that it is possible to sway a day's price with a single trade or series of bids.

c.    A Rotterdam-based bunker fuel trader stated that making deals in an effort to move prices is commonplace.

---

[1]    *Commission confirms unannounced inspections in oil and biofuels sectors*, European Commission, http://europa.eu/rapid/press-release_MEMO-13-435_en.htm.

d.   Defendant BP's traders based in Singapore reportedly "began making high bids within the Platts window, putting upward pressure on the benchmark that affected prices in Australia, according to [3 persons] knowledgeable about the situation. In some instances, the high bids never resulted in deals . . . . In others, the BP traders bought actual shipments at artificially high prices and moved them from Korea to Australia."

239.   The *Wall Street Journal* article further provides:

The Platts 50 ppm benchmark rose from about $70 in early January 2006 to nearly $100 in June. The increase boosted BP's income from diesel it refined and sold in Australia, along with the bonuses of some of BP's Singapore-based oil traders....[2]

240.   Defendants' and others' ability to manipulate prices also has repeatedly been demonstrated through government investigations and private settlements of charges that they moved or manipulated energy prices unlawfully.  Defendants were in an excellent position to do so with Brent Crude Oil as well, especially when colluding.  And they each had a far greater motive to manipulate Brent Crude Oil prices than other prices.

241.   <u>Defendant Shell</u>: Defendant Shell or one of its subsidiaries has been charged in these relevant actions.

a.   U.S. Federal Energy Regulatory Commission's ("FERC's") Final Report on Price Manipulation in Western Markets, FERC Docket No. PA02-2-000 (March 2003), at III-22 (noting Shell's Coral Energy subsidiary "interviewed all employees who provided data to the [trade publication]" and "concluded that 'the information provided to the trade publication accurately reflected then current market information'" but "Coral does not seem to address the seemingly obvious problem with reporting prices and volumes of trades that traders had 'heard about' or 'seen on electronic trading platforms.'");[3]

b.   Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, in *In the Matter of Coral Energy Resources, L.P.*, CFTC Docket No 04-21 (assessing civil monetary penalty of$30 million against Shell's Coral Energy subsidiary for manipulating natural gas prices by means of repeatedly making false reports to price index publications) (CFTC Jul. 28, 2004);

---

[2]   Traders Try to Game Platts Oil-Price Benchmarks, WALL STREET J. (Jun. 19, 2013), p. A12.

[3]   http://www.fere.gov/legal/maj-ord-reg/land-docs/PART-1-3-26-03.pdf.

c.    *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004)(denying motion to dismiss by defendants, including Shell's Coral Energy subsidiary); Stipulation and Agreement of Settlement in *In re Natural Gas Commodity Litig.*, No. 03 Civ. 6186 (S.D.N.Y.) ($5,147,500 settlement by Shell's Coral Energy Resources, L.P. subsidiary), filed Feb. 16, 2007 (ECF No. 486);

d.    Consent Order of Permanent Injunction and Other Equitable Relief Against Defendants in *CFTC v. Denette Johnson, Courtney Cubbison Moore, John Tracy, Robert Harp, and Kelly Dyer*, Civil Action No. 05 Civ. 3322 (S.D. Tex.), filed Nov. 7, 2007 (ECF No. 137) (permanent injunction and assessment of $1 million penalty).

e.    European Commission Decision C (2006) 4090 Final, Case COMPIF/38.456 - Bitumen - Netherlands (Sept. 13, 2006) (fining 14 companies, including Shell, 266.7 million euros for fixing the price of bitumen, a petroleum byproduct used to make asphalt, over eight years on the Dutch market. The fine imposed on Shell, both a leader of the plan and a repeat offender, was increased for being a repeat offender, Shell received the biggest penalty); 2012/C 355/24T (Sept. 27, 2012) (reducing fine imposed on Shell from 108 million euros to 81 million euros).[4]

242.    <u>Defendant BP</u>: Defendant BP or one of its subsidiaries has been charged in these

relevant actions.

a.    Criminal Information and Deferred Prosecution Agreement in *United States v. BP America, Inc.*, 07 CR 683 (N.D. Ill.), filed Oct. 25 and 30, 2007 (ECF Nos. 1, 6) (alleging BP Products North America, Inc., a wholly owned subsidiary of Defendant BP, and its subsidiaries and several employees inflated industry benchmark price of TEPPCO pipeline system propane; detailing terms of cooperation, assessing $100 million penalty and establishing restitution fund of $53.503 million);

b.    United States v. Mark David Radley, James Warren Summers, Cody Dean Claborn and Carrie Kienenberger, 07 CR 689 (N.D. Ill.) (individual traders);

c.    Final Order and Judgment in *In re BP Propane Direct Purchaser Antitrust Litig.*, No. 06 Civ. 3621 (N.D. Ill.), filed May 26, 2009 (ECF No. 182);

d.    Final Order and Judgment in *In re BP Propane Indirect Purchaser Litig.*, No. 06 Civ. 3541 (N.D. Ill.), filed Feb. 10, 2010 (ECF No. 207).

e.    In 2011, FERC pursued BP for "fraudulently trading physical natural gas" and for trading points in order to increase the value of its financial positions. *See* Staff Notice of Alleged Violations, FERC 1 (Aug. 12, 2011)[5] ("BP accomplished its fraud by using

---

[4]    *See Shell Wins 25% Cut in Bitumen Cartel Fine, Total Loses Bid*, Bloomberg Business Week (Sept. 12, 2012), http://www.businessweek.com/news/2012-09-27/shell-wins-25-percent-cut-in-eu-bitumen-cartel-fine-as-total-loses-bid.

[5]    http://www.ferc.gov/enforcement/alleged-violation/notices/bp-america.pdf.

transportation capacity between the two markets [Houston Ship Channel and Katy] uneconomically. In doing so, BP contributed to lower HSC Gas Daily indices to increase the value of its financial positions by making early and repeated sales; using high market concentrations; and by trading relationally to its financial spread.").

      f.    In the EC bitumen price-fixing matter, Defendant BP p.l.c. escaped a fine because it cooperated in the probe into the bitumen cartel.[6]

## J.    Defendants Trade Brent Crude Oil Futures and Derivative Contracts

243.    Defendants and their affiliates actively trade Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts in the U.S.  Defendants' manipulative actions comes both in the form of trading for profit for their own accounts and acting as broker-dealers, agents or futures commissions merchants for customers.

### a.  BP

244.    Defendant BP actively trades in the global commodity markets "in order to manage, transact and hedge the crude oil, refined products and natural gas that the group either produces or consumes in its manufacturing operations."[7]  As detailed in its 2012 Annual Report, BP trades Brent futures and options on exchanges including those listed on the ICE and NYMEX exchanges.[8]  Plaintiffs allege that Brent Crude futures and options are among the products traded by BP.

### b.  Morgan Stanley

245.    As detailed in its 2012 Annual Report, Morgan Stanley "trades and is a market-maker in exchange-traded options and futures and OTC options and swaps on commodities, and offers counterparties hedging programs relating to production, consumption, reserve/inventory

---

[6]    *See Shell Wins 25% Cut in Bitumen Cartel Fine, Total Loses Bid*, Bloomberg Business Week (Sept. 12, 2012), http://www.businessweek.com/news/2012-09-27/shell-wins-25-percent-cut-ineu-bitumen-cartel-fine-as-total-loses-bid.

[7]    BP, Annual Report (Form 20-F) (Mar. 6, 2013), at 98.

[8]    *Id.*

management and structured transactions, including energy-contract securitizations and monetization."[9]

246.    Additionally, Morgan Stanley's broker-dealer affiliates Morgan Stanley & Co. LLC and Morgan Stanley Smith Barney LLC are future commission merchants that are regulated by the CFTC and various commodity futures exchanges.[10]  Plaintiffs allege that Brent Crude futures and options are among the products traded by Morgan Stanley.

### c.  Phibro

247.    Defendant Phibro "trades on the New York Mercantile Exchange (NYMEX) division of the CME, ICE Futures Europe (ICE), the Dubai Mercantile Exchange (DME) and other exchanges, as well as in the over-the counter physical, swaps and options markets."[11]

248.    Additionally, Phibro's corporate parent, Occidental Petroleum routinely trades "derivative instruments, including a combination of short-term futures, forwards, options and swaps, to establish, as of the date of production, the price it receives and to improve realized prices for oil and gas."[12]  Plaintiffs allege that Brent Crude futures and options are among the products traded by Phibro.

### d.  Shell

249.    Shell operates a 24-hour global trading network and actively participates in trading in the crude oil markets.  In the United States, "Shell Trading US conducts a substantial

---

[9]      Morgan Stanley, Annual Report (Form 10-K) (Feb. 25, 2013), at 3.

[10]     *Id.* at 15.

[11]     http://www.phibro.com/2a-energy.htm.

[12]     Occidental Petroleum Corporation, Annual Report (Form 10-K), at 34 (Feb. 26, 2013).

trading-for-profit business, which includes the buying and selling of crude oil, . . . , as well as trading oil futures."[13]

250.    Plaintiffs allege that Brent Crude futures and options are among the products traded by Shell and its affiliates.

### e.  Statoil

251.    Defendant Statoil actively participates in trading Brent Crude Oil products.  As detailed in its Annual Report, "[t]o manage short-term commodity risk, Statoil enters into commodity-based derivative contracts, including futures, options, over-the-counter (OTC) forward contracts, market swaps and contracts for differences related to crude oil, petroleum products, natural gas and electricity."[14]  Statoil further acknowledged that it traded derivatives on ICE and NYMEX.[15]  Plaintiffs allege that Brent Crude Oil futures and options are among the products traded by Statoil.

### f.  Trafigura

252.    According to Vitol's website, the company "is a significant participant in global crude oil markets and crude oil is the largest part of Vitol's total energy portfolio," and trades "around 2.4 m barrels per day."   As described by a 2010 CFTC enforcement order, Vitol, Inc. and a Bermuda-based affiliate, Vitol Capital Management Ltd., trade NYMEX energy futures and options on futures markets.

253.    Trafigura's trading operations are integrated with its local storage, shipping, and chartering departments which enables the company "to react quickly to shifting demand

---

[13]      http://www.shell.com/global/products-services/solutions-for-businesses/shipping-trading/about-shell-trading.html.

[14]      Statoil, Annual Report (Form 20-F) (Mar. 21, 2013), at 172.

[15]      *Id.*

patterns."[16]  Plaintiffs allege that Brent Crude futures and options are among the products traded by Trafigura and its affiliates.

### g.  Vitol

254.    According to Vitol's website, the company "is a significant participant in global crude oil markets and crude oil is the largest part of Vitol's total energy portfolio," and trades "around 2.4 m barrels per day."[17]   As described by a 2010 CFTC enforcement order, Vitol, Inc. and a Bermuda-based affiliate, Vitol Capital Management Ltd., trade NYMEX energy futures and options on futures markets.[18]   Indeed, in February 2011, Vitol's CEO Ian Taylor suggested that "the more reliable Brent futures contract will take center stage."[19]

255.    Plaintiffs allege that Brent Crude futures and options are among the products traded by Vitol.

## V.    DEFENDANTS' CONDUCT HAD A DIRECT, SUBSTANTIAL, AND REASONABLY FORESEEABLE EFFECT ON U.S. COMMERCE

256.    Brent Crude Oil and Brent Crude Oil futures contracts are each a commodity that trades in U.S. interstate and foreign commerce.  Defendants' restraint of trade and manipulation of Brent Crude Oil and Brent Crude Oil futures contract prices had direct, substantial, and reasonably foreseeable effects in the United States, and on Plaintiffs and members of the Class.

257.    Brent Crude Oil futures contracts are traded domestically on NYMEX and on electronic boards of trade and exchanges, such as ICE, which are readily accessible within the United States.  Defendants, as sophisticated Brent Crude Oil market participants, knew, or had

---

[16]      "Infrastructure," http://www.trafigura.com/trading/oil-and-petroleum/crude/.

[17]      *See* http://www.vitol.com/crude-oil.html.

[18]      *See In the Matter of Vitol Inc. and Vitol Capital Management Ltd.,* CFTC Dkt. No. 10-17 (Sept. 14, 2010).

[19]      *See* Grant Smith, "Vitol's Taylor Expects More OPEC Oil, Brent to Slide to $90-$100," Bloomberg (Feb. 22,  2011),  http://www.bloomberg.com/news/2011-02-22/vitol-s-taylor-expects-more-opec-oil-brent-to-slide-to-90-100.html.

good reason to know, that Brent Crude Oil prices published and compiled by Platts are disseminated in the United States and are used to price, settle, and benchmark Brent Crude Oil futures contracts and/or other Brent Crude Oil derivative contracts traded in the United States.

258.   For these reasons, Defendants knew, or had good reason to know and were reckless in not knowing, that misreporting the price of Brent Crude Oil to Platts, as well as other manipulative and collusive conduct in the Brent Crude Oil market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including, without limitation, on the prices of Brent Crude Oil futures contracts transacted domestically.

## VI.   EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

259.   Plaintiffs disclaim any burden to plead facts regarding the statute of limitations.

260.   Defendants concealed their wrongdoing in the Brent Crude Oil market.  Plaintiffs could not in the exercise of due diligence have discovered Defendants' wrongdoing as alleged herein.

261.   Application of the doctrine of fraudulent concealment tolled the statute of limitations as to the claims asserted by Plaintiffs and members of the Class. Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until at least on or about May 14, 2013, when the EC confirmed that it had carried out unannounced inspections at the premises of several companies in order to obtain documents relating to contrived reporting to move or manipulate Brent crude oil prices.

262.   By its very nature, as alleged herein, the unlawful activity that Defendants engaged in was self-concealing.  Defendants, among other things, conspired and engaged in secret activities in order to manipulate, through contrived reports to PRAs, Brent Crude Oil prices and the prices of Brent Crude Oil futures contracts traded on the ICE and NYMEX.

263.   Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the members of the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in May 2013.

264.   For these reasons, among others including those alleged herein and presently unknown to Plaintiffs and members of the Class, the statute of limitations applicable to Plaintiffs and the Class' claims was tolled and did not begin to run until May 2013.

## VII.   RELEVANT MARKET

265.   The relevant market in this case is the Brent Crude Oil Market, which comprises: (1) the Brent Crude Oil physical cargo market; (2) NYMEX Brent Futures, ICE Brent Futures and other Brent Crude Oil derivatives; and (3) the Platts MOC market for various types of Brent Crude Oil physical cargoes and derivatives thereon.

## VIII.   CLASS ALLEGATIONS

266.   Plaintiffs bring this action on behalf of themselves, and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"). The Class consists of:

> All persons, corporations and other legal entities that transacted in and/or held (a) ICE Brent Crude Oil futures contracts and/or (b) NYMEX Brent Crude Oil futures contracts during the Class Period (*i.e.*, 2002 through the present). Excluded from the Class are Defendants and any parent, subsidiary, affiliate, employee or agent of any Defendant.

267.   FRCP Rule 23(a)(1). Class members number in the hundreds or, perhaps, thousands, and are geographically dispersed such that joinder is impractical.

268.   FRCP Rule 23(a)(2). Common issues of fact and law include but are not limited to:

a.      Whether Defendants manipulated Dated Brent prices and price trends and manipulated ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts in violation of the CEA;

b.      Whether Defendants are liable under the CEA for such manipulation;

c.      Whether Defendants are vicariously liable for such manipulation, or liable for aiding and abetting such manipulation;

d.      Whether Defendants' unlawful actions violate Sections 1 and 2 of the Sherman Antitrust Act;

e.      Whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

f.      Whether Defendants unjustly enriched themselves or are otherwise responsible for disgorgement/restitution under the common law;

g.      The operative time period and extent of Defendants' violations; and

h.      The appropriate relief.

269.    Rule 23(a)(3). Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

270.    Rule 23(a)(4). Plaintiffs are not antagonistic to the Class, are an adequate class representative, and have retained adequate counsel.

271.    Rule 23(b)(3). Common issues predominate over individual issues (if any). A class action is superior to other methods (if any) for a fair and efficient adjudication of this case. Indeed, a class action is the only method by which Plaintiffs and the Class can efficiently seek redress because of "negative value" claims. The records of commodity futures traders are

required to be maintained by futures commission merchants. Plaintiffs do not anticipate any difficulties in the identification of Class members, notice to Class members or other aspects of the management of this action as a class action.

## IX.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**(Manipulation In Violation of the**
**Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)**
**Against All Defendants**

272.    Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

273.    By their intentional misconduct, Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of Brent Crude Oil and Brent Crude Oil futures contracts to be artificial during the Class Period.  Defendants, through their acts alleged herein, that occurred between 2002 and the present, specifically intended to and did cause unlawful and artificial prices of Brent Crude Oil, ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts in violation of CEA, 7 U.S.C. §§ 1, *et seq*.

274.    Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of Brent Crude Oil futures contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

275.    Defendants' foregoing extensive manipulative conduct deprived Plaintiffs and other traders of a lawfully operating market during the Class Period.

276.    Defendants acted for one another, including as alleged herein. In all the circumstances previously alleged, each Defendant had the ability to cause and did cause artificial prices.

277.    Plaintiffs and others who transacted in Crude Oil futures, including, Brent Crude Oil futures contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq*., and as a direct result thereof were injured and suffered damages.

278.    Plaintiffs and the Class are each entitled to damages for the violations of the CEA alleged herein.

279.    Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

280.    Plaintiffs and members of the Class who purchased or sold Crude Oil futures contracts, including Brent Crude Oil futures contracts on NYMEX or ICE during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

### SECOND CLAIM FOR RELIEF
### (Manipulation by False Reporting and Fraud and Deceit In Violation of the Commodity Exchange Act, as Amended, 7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a)) Against All Defendants

281.    Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

282.    By their intentional and reckless misconduct, Defendants each violated Section 6(c)(1) of the CEA, as amended, 7 U.S.C. § 9, and caused prices of Brent Crude Oil futures contracts, including ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts, to be artificial during the Class Period.  Defendants delivered and caused to be delivered for transmission through the mails and interstate commerce, by multiple means of communication, including communications to Platts, a false or misleading or inaccurate report concerning market

information or conditions that affect or tend to affect the price of Brent Crude Oil and Brent Crude Oil futures, which are commodities in interstate commerce, knowing, or acting in reckless disregard of the fact that such report was false, misleading or inaccurate.

283.    Under Section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commodity Futures Trading Commission ("CFTC"), which shall promulgate by not later than 1 year after July 21, 2010.

284.    In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a) (2011), which provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud, make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading.

285.    Unlawful manipulation under the CEA, as amended, and Rule 180.1 includes delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

286.    During the Class Period, Defendants used or employed manipulative or deceptive devices or contrivances, in connection with a contract of sale of Brent Crude Oil in interstate

commerce, including, but not limited to, making untrue or misleading statements of material facts, or omitting material facts necessary to make the statements made not misleading, including:

     a.  Making untrue or misleading statements to Platts during the MOC window regarding their BFOE transactions;

     b.  Failing to disclose, and omitting, that they entered wash transactions;

     c.  Failing to disclose, and omitting, that they were unlawfully conspiring between and among themselves to manipulate Brent Crude Oil prices;

     d.  Failing to disclose, and omitting, that they were reporting bids, offers and transactions to Platts during the MOC process to move Brent Crude Oil prices to benefit their derivative positions;

     e.  Issuing statements and directly engaging in the acts alleged herein knowingly or with reckless disregard for the truth;

     f.  employing other deceptive devices as described above.

287.    Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

288.    Plaintiffs and the Class are each entitled to damages for the violations of the CEA alleged herein.

### THIRD CLAIM FOR RELIEF
**(Principal-Agent Liability In Violation of the
Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)
Against all Defendants**

289.    Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

290.    Defendants BP, Shell, and Statoil and others were each an agent and/or other person on behalf of the other Defendants.  Because they acted pursuant to and were members of a conspiracy and unlawful agreement, Defendants acted as one another's agents during the Class Period.

291.    This included when Defendants, through their employees, agents and/or others directed, developed, executed and otherwise acted with respect the scheme alleged herein. Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), each of the aforementioned Defendants is liable for the acts of its employees, agents and/or another person acting for it in the scope of their employment.

292.    Plaintiffs and Class members are each entitled to damages for the violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**(Aiding and Abetting Liability In Violation of the**
**Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq*.)**
**Against All Defendants**

293.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

294.    All Defendants are also liable for aiding and abetting manipulation.

295.    Each and every Defendant had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants.

296.    Each Defendant made and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

297.    Each Defendant supervised the making of and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

298.    Each Defendant, by and through their respective partners, agents, employees and/or other persons, benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

299.    Each Defendant participated in the development of the manipulative scheme and participated in the execution of, and supervised, the manipulative acts. Each Defendant also benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

300.    Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations alleged herein.  Defendants did so knowing of each other's manipulation of Brent Crude Oil market prices, and willfully intended to assist these manipulations, which resulted in Brent Crude Oil futures contracts to reach artificial levels during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(l).

301.    Plaintiffs and Class members are each entitled to actual damages for the violations of the CEA alleged herein.

**FIFTH CLAIM FOR RELIEF**
**(Contract Combination or Conspiracy to Manipulate**
**Prices in Violation of Section 1 of the Sherman Act,**
**15 U.S.C. § 1)**
**Against All Defendants**

302.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

303.     Defendants constituted and/or entered into a contract, combination or conspiracy in restraint of trade, i.e., to manipulate or fix prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts during the Class Period in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

304.     During the Class Period, Defendants possessed market power in the setting of Brent Crude Oil prices and the prices of Brent Crude Oil futures contracts.

305.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial Brent Crude Oil market prices and the prices of Brent Crude Oil futures contracts. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

306.     Each of the Defendants acted with full awareness of the anticompetitive purpose of the conduct they were entering into and the manner thereof. Defendants exercised their independent judgment and skill to effectuate the purposes of the unlawful restraint of trade, i.e., to manipulate and set the prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts during the Class Period.

307.     Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

308.     ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts are traded throughout the United States in interstate commerce. During the Class Period, Plaintiffs and members of the Class transacted in and/or held ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts at prices that were set and otherwise made artificial as a result of Defendants' unlawful acts.

309.    During the Class Period, Defendants acted in interstate commerce within the United States.

310.    Defendants' contract, combination, and conspiracy unreasonably restrained trade and commerce, made artificial the prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts, and caused misleading signals to be sent to market participants.

311.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property.  Plaintiffs and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

### SIXTH CLAIM FOR RELIEF
### (Violation of Section 2 of the Sherman Act,
### 15 U.S.C. § 2)
### Against All Defendants

312.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restate herein.

313.    In violation of Section 2 of the Sherman Act and Section 4 of the Clayton Act, Defendants entered monopolized and conspired to monopolize the Brent Crude Oil Market.

314.    During the Class Period, as major producers and market participants and contributors to Platts pricing assessments for Brent Crude Oil, Defendants attempted to monopolize and did monopolize the Brent Crude Oil Market, including the MOC.

315.    During the Class Period, Defendants controlled the delivery points and the trading in the MOC process.  They therefore also controlled prices in the market for Brent Crude Oil-based derivative contracts, including futures contracts.  Defendants' unlawful price control of the Brent Crude Oil Market during the Class Period reflects monopoly power.   The conduct

consisted of a concerted effort between and among Defendants and their co-conspirators and in furtherance of which they created artificial prices for Brent Crude Oil-based derivative contracts, including futures contracts.

316.   During the Class Period, Defendants provided Platts during the MOC process with physical or derivative transaction data based on false, inaccurate or misleading information for the purpose of affecting Brent Crude Oil prices.

317.   Defendants' conduct and its resulting impact on the Brent Crude Oil Market occurred in or affected interstate and international commerce.

318.   The anticompetitive effects of Defendants' conduct far outweigh any ostensible competitive benefits or justifications.

319.   Plaintiffs and members of the Class have been injured in their business or property by Defendants' attempted monopolization and monopolization of the Brent Crude Oil Market.

320.   Defendants' anticompetitive conduct had severe adverse consequences on competition and price discovery.  Plaintiffs and other members of the Class that traded Brent Crude Oil futures and futures linked to the price of Dated Brent during the Class Period were deprived of normal, competitive trading patterns and, instead, were subjected to artificially determined prices as a result of Defendants' unlawful and manipulative conduct.  As a consequence thereof, Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

321.   Plaintiffs and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

**SEVENTH CLAIM FOR RELIEF**
**(Unjust Enrichment And Restitution/Disgorgement)**
**Against All Defendants**

322.     Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

323.     Defendants financially benefited from their unlawful acts, and it is unjust and inequitable for Defendants to have enriched themselves in this manner.

324.     These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact Brent Crude Oil futures contracts at artificial prices.

325.     Commodity futures contract trading is a zero sum game.  To the extent that Defendants benefited from their extensive unlawful acts, they necessarily did so by forcing Plaintiffs and members of the Class to lose.

326.     All traders enter the same standardized contract subject to the same rule set.  This prominently includes rules and laws prohibiting manipulation.

327.     It would be inequitable for Defendants to be permitted to violate that rule set and still retain the benefit that Defendants obtained from such violation at the expense of Plaintiffs and members of the Class.

328.     Equity and good conscience require restitution by Defendants.

329.     Each Defendant should pay restitution or its own unjust enrichment to Plaintiffs and members of the Class.

330.     Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.     For judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment and post-judgment interest at the maximum rate allowable by law;

C.     For a judgment awarding Plaintiffs and the Class treble damages against Defendants as a result of their unlawful, anticompetitive conduct alleged herein under applicable federal antitrust law;

D.     For a judgment awarding Plaintiffs and the Class the amount of Defendants' unjust enrichment;

E.     For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

F.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: October 3, 2013

KIRBY McINERNEY LLP

By: _____

David E. Kovel
Lauren Wagner Pederson, Of Counsel
Thomas W. Elrod
dkovel@kmllp.com
lpederson@kmllp.com
telrod@kmllp.com
825 Third Avenue, 16th Floor
New York, New York 10022
Telephone:  (212) 371-6600
Facsimile:   (212) 751-2540

*Counsel for Plaintiffs and the Proposed Class*